**EXHIBIT**

**B**

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| PARAGON PARTNERS, INC., an Illinois Corporation, | ) | |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Plaintiff, | ) | |
| | ) | |
| | ) | Cause No.: 4:20-CV-011069 |
| vs. | ) | |
| | ) | |
| EFS COMPANIES, LLC, a Delaware limited liability company, | ) | |
| | ) | |
| EGS ADMINISTRATION, LLC, a Delaware limited liability company, | ) | |
| | ) | |
| ENSURETY VENTURES, L.L.C., a Missouri Limited liability company, | ) | |
| | ) | |
| EGV COMPANIES, INC., a Delaware corporation | ) | |
| | ) | |
| BARANTAS INCORPORATED, a Missouri Corporation | ) | |
| | ) | |
| ST. AUBREY SERVICES, LLC, a Missouri limited liability company | ) | |
| | ) | |
| Patrick J. O'Brien | ) | |
| | ) | |
| And | ) | |
| | ) | |
| Brian P. Fox. | ) | |
| | ) | |
| Defendants. | ) | |

### SECOND AMENDED COMPLAINT

COMES NOW Paragon Partners, Inc. ("Plaintiff"), by and through its undersigned counsel, and for its Second Amended Complaint against Defendants, alleges as follows:

## INTRODUCTION

1.      This action arises from a series of wire frauds that injured Plaintiff by defrauding it of its share of profits derived from a call center business.

2.      Defendants include affiliated companies and individuals that compete in the highly competitive, technical, and specialized market of vehicle service contracts ("VSC").[1] Sitting atop this organization is Defendant O'Brien and his right arm, his nephew and cohort Defendant Fox.

3.      VSCs provide coverage to automobile owners for parts replacement and/or repairs during a defined term.[2] Defendants sell and administer VSCs under the service marks "Omega Auto Care" and "TheTechChoice," respectively.[3]

4.      Defendant Barantas, Incorporated ("BI") began doing business with Enterprise Financial Group, Inc. ("EFG") in 2008, procuring agreements with vehicle dealerships and independent call centers on a commission basis to sell VSCs administered by EFG. This relationship evolved into Defendant BI marketing and selling TechChoice VSCs administered by EFG on a non-exclusive basis.

5.      When some of the independent call centers located around the country that sold VSCs administered by EFG went out of business, thereby leaving customers with expired or near expiring VSCs without a customer service representative or seller ("Orphan Holders"), EFG and Defendants BI and EGS Administration, LLC ("EGS") came together at the end of 2014 and/or the beginning of 2015 and agreed to provide customer service to these Orphan Holders and to renew their TechChoice VSCs administered by EFG that had expired or were nearing expiration.

[1] Verified Petition, *Barantas, Inc. et al. v. National Vehicle Protection Services, Inc. n/k/a Dealership Warranties, Inc.,* Case No. 1711-CC00537, The Eleventh Judicial Circuit, State of Missouri, June 5, 2017.
[2] *Id.*
[3] "TheTechChoice" service mark was registered with the U.S. Patent and Trademark Office on November 17, 2009, and the "Omega Autocare" service mark was so registered on July 7th, 2013.

2

This was a legitimate enterprise. On or about this same time, EFG voluntarily communicated its trade secret customer data to Defendants for this sole purpose.

6.     Defendant Fox also enlisted Plaintiff to assist in the management of this new independent call center business to provide customer service to Orphan Holders, and to renew their TechChoice VSCs administered by EFG that had expired or were expiring. This is how Defendants conducted this call center business at the outset. But further into Defendants' operations of this business and unbeknownst to Plaintiff, Defendant Fox hatched a scheme to misappropriate this trade secret customer data that EFG provided to Defendants for the singular purpose of renewing TechChoice VSCs administered by EFG that had expired or were near expiring, to sell competing Omega VSCs to Orphan Holders, and in the process, to defraud Plaintiff of its share of profits derived from its management of the call center business to offset Defendants' legal liabilities to EFG for this misappropriation.

7.     Over a period of four (4) years, Defendant Fox schemed to misappropriate EFG's trade secret customer data and defraud Plaintiff to pay for it.

- It began on March 12, 2015, when Defendant Fox knew that a secret overfund was added to each TechChoice and Omega VSC to reserve for this liability to EFG;

- Continued through February 7, 2017, when EFG terminated its relationship with Defendants as well as the rights to use its trade secret customer data;

- Continued through April 21, 2017, when Defendant Fox nonetheless misappropriated EFG's trade secret customer data to send 6,907 "pink notices" to EFG customers;

- Continued through June 5, 2017, when Defendant O'Brien nonetheless misappropriated this trade secret customer date to bring a lawsuit against National Vehicle Protection Service ("NVPS") to prevent NVPS from working with EFG;

- Continued through March 8, 2018, during which Defendant Fox committed wire fraud to deprive Plaintiff of its share of the secret overfund that was added to thousands of TechChoice and Omega VSCs to fund this reserve;

- Continued through September 27, 2018, when Defendants settled EFG's misappropriation of trade secrets lawsuit for upwards of $3,000,000 upon information and belief, and dismissed with prejudice the NVPS lawsuit;

- And ended on March 12, 2019, when Defendants fraudulently overstated their reserves and expenses and emailed those fraudulent financial statements to Plaintiff to deprive it of more than $3,000,000 of reserves, which requires Plaintiff to file this Second Amended Complaint.

<u>**JURISDICTION AND VENUE**</u>

8.      This Court has federal question subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.  This Court also has diversity subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties' citizenship is completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court also has pendent jurisdiction over the state law claims that arise out of the common nucleus of operative facts. *United Mine Workers v. Gibbs*, 383 U.S. 717, 725 (1966).

9.      Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. 1391 because (i) each Defendant is subject to personal jurisdiction in this judicial or resides in this district; (ii) Defendants conduct a significant amount of business within this judicial district; and (iii) the wrongful conduct giving rise to this action and/or was directed from this judicial district.

## PARTIES

10.    Plaintiff Paragon Partners, Inc. ("Plaintiff") is, and at all times relevant hereto was, a corporation incorporated under the laws of the State of Illinois on February 11, 2015, with its principal place of business located in Dupo, Illinois. Plaintiff was voluntarily dissolved on December 20, 2019. Pursuant to 805 ILCS 5/12.80, this action has been commenced within five years after the date of Plaintiff's dissolution with respect to this right or claim existing prior to, at the time of, or after such dissolution. Section 1964(c) creates a private right of action for any "person" who has suffered a compensable injury. 18 U.S.C. § 1964(c). The term "person" refers to "any individual or entity capable of holding legal or beneficial interest in property." 18 U.S.C. § 1961(3).

11.    Defendant EFS Companies, LLC ("EFS") is, and at all times relevant hereto was, a limited liability company formed under the laws of the State of Delaware. Its members are Defendant BI, a citizen of the State of Missouri, BFB Consulting, LLC, a citizen of the State of Missouri, and KEAF Investments, Inc., a citizen of the State of Missouri.  Defendant O'Brien is the President of Defendant EFS.

12.    Defendant EGS Administration, LLC f/k/a/ Ensurety Group Services, LLC ("EGS") is, and at all times relevant hereto was, a limited liability company formed under the laws of the State of Delaware. Its sole member is Ensurety Ventures, LLC, a citizen of the State of Missouri. Defendant O'Brien is the President of Defendant EGS.

13.    Defendant Ensurety Ventures, L.L.C. ("EVS") is, and at all times relevant hereto was, a limited liability company formed under the laws of the State of Missouri. Its members are Barantas, Incorporated, a citizen of the State of Missouri, and BFB Consulting, LLC, a citizen of the State of Missouri.

14.     Defendant EGV Companies, Inc. ("EGV") is, and at all times relevant hereto was, a corporation formed under the laws of the State of Delaware, with its principal place of business located at 2342 Technology Drive, O'Fallon, Missouri 63368. Defendant O'Brien is the President of Defendant EGV.

15.     Defendant Barantas Incorporated ("BI") is, and at all times relevant hereto was, a corporation formed under the laws of the State of Missouri with its principal place of business located at 2342 Technology Drive, O'Fallon, Missouri 63368. Defendant O'Brien is the President of Defendant BI.

16.     Defendant St. Aubrey Services, LLC ("STS") is, and at all times relevant hereto was, a limited liability company formed under the laws of the State of Missouri. Its members are Defendant O'Brien and Susan O'Brien, citizens of the State of Missouri and Trustees of the Qualified Joint Revocable Trust of Patrick James O'Brien and Susan Marie O'Brien, dated January 11, 2017, and Defendant Fox and Brittany Marie Fox, citizens of the State of Missouri and Trustees of the Qualified Spousal Trust of Brian Patrick Fox and Brittany Marie Fox, dated June 24, 2020.

17.     Defendant Patrick J. O'Brien is a citizen of the State of Missouri who resides at 4618 Crosshaven Court, St. Charles, Missouri 63304. Mr. O'Brien is, and has been at all times relevant herein, the president of BI, the president of EGV, and manager of EGS.

18.     Defendant Brian P. Fox is a citizen of the State of Missouri who resides at 38 Windcastle Drive, St. Charles, Missouri. Mr. Fox is, and has been at all times relevant herein, a manager of EGS and a vice president of EGV.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### The Inception of "TheTechChoice" and "Omega Auto Care"

19.     Defendant BI, which was incorporated in 2002 and operates in all 50 states, is "a designer, marketer, and agent" of VSCs. Among other products in its portfolio, Defendant BI designs and sells TechChoice VSCs and Omega VSCs.[4]

20.     Effective February 22, 2008, third-party Enterprise Financial Group, Inc. ("EFG") and Defendant BI entered into an Administrative Private Label Agreement ("2008 Private Label Agreement"). The 2008 Private Label Agreement is attached hereto as Exhibit A and incorporated herein by reference.

21.     Pursuant to this agreement, Defendant BI's general responsibilities included procuring agreements with vehicle dealerships and independent call centers for the sale of TechChoice VSCs for EFG and to administer and provide other information, expertise, and assistance to EFG.[5]

22.     EFG paid commissions to Defendant BI for the TechChoice VSCs administered by EFG that were sold by vehicle dealerships and independent call centers procured by Defendant BI, including Defendant EGS.

23.     Effective February 20, 2008, Moxy Solutions, Inc., a business engaged in providing software packages that includes a rating engine and provides fulfillment services for administrators and sellers in the VSC industry ("Moxy"), entered into an Administrative Services Agreement with EFG, pursuant to which Moxy agreed to electronically transmit the sales activity of EFG's call centers to EFG on a weekly basis and print and mail the completed VSC to customers, to include the declaration page, policy language, and state addendums. The

---

[4] Verified Petition, *Barantas, Inc. et al. v. National Vehicle Protection Services, Inc. n/k/a Dealership Warranties, Inc.,* Case No. 1711-CC00537, The Eleventh Judicial Circuit, State of Missouri, June 5, 2017.
[5] *Id.*

Administrative Services Agreement is attached hereto as <u>Exhibit B</u> and incorporated herein by reference.

24.     Upon information and belief, Defendant O'Brien owns 20% - 25% of Moxy.

25.     Effective October 1, 2009, EFG and Defendant BI entered into a second agreement, this one being a Seller Agreement for Administrative Services (the "2009 Seller Agreement"). The 2009 Seller Agreement is attached hereto as <u>Exhibit C</u> and incorporated herein by reference.

26.     Pursuant to this agreement, Defendant BI's general duties were to solicit the sale of TechChoice VSCs administered by EFG to customers, to set the total contract prices for those TechChoice VSCs, and to pay EFG for its administration services for those TechChoice VSCs sold  (the "Seller Cost").

27.     For each TechChoice or Omega VSC sold, Defendant BI received the bulk of the total contract price.[6]

28.     EFG administers all TechChoice VSCs pursuant to the 2008 Private Label Agreement and the 2009 Seller Agreement. As administrator the services include, among others, underwriting and claims adjustment.[7]

29.     Between approximately 2008 and 2017, Defendant BI sold thousands of TechChoice VSCs to consumers through various call centers, including Defendant EGS. Some of these call centers went out of business, however, leaving Orphan Holders without a customer service representative or a seller to remarket and renew expired or expiring TechChoice VSCs to them.[8]

---

[6] *Id.*
[7] *Id.*
[8] *Id.*

### EFG Communication of Trade Secret Customer Data

30.     From 2009 through 2015, Defendant O'Brien received production reports from EFG showing the number of VSCs generated through the call centers pursuant to which Defendant BI was receiving a commission pursuant to the 2008 Private Label Agreement and the 2009 Seller Agreement.[9]

31.     Starting in early 2015, Defendants O'Brien and Fox started asking for much more detailed confidential customer information from EFG, which included customer name; customer address; customer contact information; customer vehicle make, model, year, VIN, and mileage, and VSC term ("Customer Data").[10]

32.     EFG communicated this Customer Data to Defendants O'Brien and Fox for the sole purpose of providing customer service to Orphan Holders and renewing their TechChoice VSCs administered by EFG that had expired or were nearing expiration.

33.     The Customer Data was confidential and proprietary, valuable, and difficult, if not impossible to duplicate.[11]

34.     The Customer Data qualifies as a trade secret under § 417.453(4), RSMo.[12]

35.     Effective January 5, 2015, EFG as administrator and Defendant EGS as seller entered into a Seller Agreement for Administrative Service (the "January 2015 Seller Agreement") *for the sale and administration of TechChoice VSCs only*. The January 2015 Seller Agreement is attached hereto as Exhibit D and incorporated herein by reference.

---

[9] Deposition of Patrick O'Brien, Vol. 1, August 15, 2017, p. 93, *Enterprise Financial Group, Incorporated v. Barantas, Incorporated, Patrick J. O'Brien, Brian P. Fox, and EGS Administration, LLC*; Cause No. DC-17-01503, 191st District Court of Dallas County, Texas.

[10] *Id.*, pp. 95-96.

[11] *Id.* at pp. 131-132.

[12] Verified Petition, *Barantas, Inc. et al. v. National Vehicle Protection Services, Inc. n/k/a Dealership Warranties, Inc.,* Case No. 1711-CC00537, The Eleventh Judicial Circuit, State of Missouri, June 5, 2017.

36.     Effective October 13, 2015, EFG as administrator and Defendant EGS as seller entered into a Call Center Seller Agreement (the "October 2015 Seller Agreement") *for the sale and administration of TechChoice VSCs only*. The October 2015 Seller Agreement is attached hereto as Exhibit E and incorporated herein by reference.

37.     ***Every*** sale of a TechChoice or Omega VSC for this call center was *sold* exclusively by either Defendant BI or Defendant EGS who, in each case, received the total purchase price for the VSC sold.[13]

## The Creation of "TechChoice Services, a/k/a "The Renewal Center"

38.     On December 29, 2014, Defendant Fox formed Defendant EGS.

39.     Defendant EGS was part of an independent call center ("TechChoice Services" a/k/a "The Renewal Center") that also renewed TechChoice VSCs for Orphan Holders and to sell Omega VSCs.  But Defendant BI continued to also sell both TechChoice and Omega VSCs after the formation of Defendant EGS and through early 2017.[14]

40.     Defendant EVS formed Defendant EVG on April 24, 2013, and Defendant BI formed Defendant EFS on April 1, 2014.[15]

41.     Defendant EGV, *inter alia*, provides administration for Omega VSCs sold by Defendant BI and Defendant EGS. As such, it functions in much of the same way as EFG does with respect to TechChoice VSCs.

42.     EGV earns administration revenues derived from the sale of Omega VSCs for The Renewal Center in the same manner as administration revenues are earned by third-party EFG for the sale of TechChoice VSCs.

43.     ***All*** Omega VSCs are administered by Defendant EGV.[16]

---

[13] *Id.*
[14] *Id.*
[15] *Id.*

44.     Defendants EGS and EGV are "sister" companies having the same owner, Defendant EVS. Defendant EVS is the sole shareholder of Defendant EGV and the sole member of Defendant EGS.

45.     Defendant O'Brien is the President of both Defendants EGS and EGV and upon information and belief, both Defendants EGS and EGV have the same other corporate officers.

46.     Defendants EGS and EGV failed to maintain an arm's length relationship with respect to Defendant EFG's administration of Omega VSCs.

47.     Upon information and belief, Defendants EGS and EGV commingle funds through a series of intercompany loans going back and forth between them derived from revenues of the Business.

48.     Upon information and belief, the employees of Defendant EGS and EGV are paid from a single payroll system provided by Defendant STS.

49.     Defendants EGS and EGV are so inextricably linked that they cannot be considered separate entities.

50.     Defendant EFS, *inter alia*, provides administration for consumer financing of TechChoice and Omega VSCs. EFS earns administration revenue for consumer financing of both TechChoice and Omega VSCs for The Renewal Center.

51.     Customers who finance their VSCs through EFS do so pursuant to a Payment Plan Agreement between the customer and the seller, either Defendant BI or Defendant EGS, on behalf of the administrator, either EFG or Defendant EGV, depending on whether a TechChoice or Omega VSC is financed. [17]

---

[16] *Id.*
[17] *Id.*

52.     Defendant STS, *inter alia*, administrates human resources for The Renewal Center.

53.     Upon information and belief, Defendants BI, EGS, EGV, STS, EVS, and EFS, allocate employee costs as well as related overhead expenses to The Renewal Center through Defendant STS for tasks including accounts payable, cancellations, payroll processing, employee benefit management, employee onboarding/terminations, funding reports, financial statement preparation, various state/federal agency reporting, top level management, down-payment deposit reconciliations, cancellation trend reviews, and reserve reviews for all TechChoice and Omega VSCs sold by The Renewal Center.

54.     These overhead allocations for 2017 costs were in the amount of $57,842.83 and $50,542.24 for 2018.

### The "Management Agreement"

55.     On April 2, 2015, Defendant Fox emailed a draft Management Agreement between Defendant EGS and Plaintiff to Dennis Phelps, president of Plaintiff, for the operation of The Renewal Center, pursuant to which he represented to Mr. Phelps, "the management fee for Paragon is 49% of the net revenue, less all overhead costs of operating the business" (the "Management Agreement").   The Management Agreement is attached hereto as <u>Exhibit F</u> and incorporated herein by reference.

56.     On February 26, 2016, Defendant Fox emailed the Management Agreement to Paragon a second time, this time to be signed, pursuant to which he again represented to Mr. Phelps, "the management fee for Paragon is 49% of the net revenue, less all overhead costs of operating the business."

57.     Plaintiff signed the Management Agreement on or about February 26, 2016, and as instructed, used the U.S. mails to send it to Stephen J. Smith, counsel for Defendant Fox.

58.     The purpose of the Management Agreement in effect was to form a joint venture-type arrangement between the Defendants and Plaintiff to share in the profits (not losses) derived from the operation The Renewal Center a/k/a the "Business."

59.     An Exhibit A thereto was created but not completed. Consequently, no further detail was provided as to Plaintiff's duties.

## The Management Fee

60.     Pursuant to the Management Agreement, Plaintiff was entitled to a "management fee" equal to 49% of the *Net Income* of the Business (the "Management Fee"). The "management fee" was a fee in name only because payments to Plaintiff thereunder were based entirely on a split of the Net Income (not the losses) of the Business and not fee based.

61.     "Net Income" was defined as the net revenue of the Business on a cash basis (the "Net Revenue"), less all expenses of operating the Business, which included, but were not limited to: (i) all employee expenses to operate the Business, including but not limited to, wages, payroll taxes, and other benefits of staff employees (the "Payroll Expenses"); (ii) insurance, lease payments, utilities, professional fees, and other customary business expenses (the "Operating Expenses"); less (iii) a reasonable reserves for the Business, as calculated by the Defendants (the "Reserves").[18]

62.     Defendant EVS prepared the funding reports, financial statements, and reconciliations for the Business.

63.     Defendant EVS calculated Net Revenue as the sum of Down Payments, Commission revenue, Cancel Reserve, and PIFs, minus Refunds.

---

[18] Exhibit F.

**Net Revenue of the Business includes the EVG Revenues**

64.     Based on the EGS Funding Reports, Defendant EVS calculated "Commission Revenue" as net of the administration revenues for administration by third-party EFG and Defendant EGV.

65.     Based on the EGS Funding Reports, an allocation of personnel expenses for Defendant EGV administration is deducted from the Net Revenue of the Business.

66.     Based on the EGS Funding Reports, an allocation of overhead costs for Defendant EGV administration is deducted from the Net Revenue of the Business.

67.     Defendants EGS and EGV are so inextricably linked that they cannot be considered separate entities. *Angell v. Santefort Family Holdings LLC dba Tri-star Estates*, --- N.E.3d --, 2020 IL App (3d) 180724 (Ill. Ct. App. 2020).

68.     The deduction of the administration revenues for Defendant EGV administration of Omega VSCs sold by the Business was in breach of the Management Agreement.

69.     Pursuant to Defendant EVS calculations, the administration revenue for Defendant EVG administration of Omega VSCs that should have been included in the calculation of Net Revenue as reflected in the EGS Funding Reports of the Business was a least $1,488,931 for 2015, $2,040,446 for 2016, $4,065,085 for 2017, $1,675,000 for 2018, and $299,183 for 2019, totaling $9,568,645.

70.     Pursuant to Defendant EVS calculations, the administration revenue for Defendant EGV administration of Omega "M2M" VSCs that should have been included in the calculation of Net Revenue as reflected in the EGS Funding Reports of the Business was at least $40,924 for 2016, $471,169.46 for 2017, $211,919.38 for 2018, and $24,439.44 for 2019, totaling $748,452.28.

71.     Pursuant to Defendant EVS calculations, other transfers from the Business to Defendant EGV as reflected in the financial statements in the amounts of $754,029.98 for 2017, $1,240,000.00 for 2018, and $135,000.00 for 2019 do not correlate to the administration revenue as stated in the EGS Funding Reports.

72.     The exact amount of Defendant EGV revenue that should have been included in Net Revenue for the calculation of the 49% distribution to Plaintiff will be proven at trial.

<u>**Net Revenue of the Business includes Overfunds**</u>

73.     An overfund is the amount that Defendant Fox added to rate schedules of the TechChoice and Omega VSCs as reported to Moxy.

74.     On February 27, 2015, Defendant Fox sent an email to Matt O'Brien directing him to set up an overfund of $125 to hold as an additional reserve for EGS as needed.

75.     On March 10, 2015, Matt O'Brien sent an email to Moxy to have an additional $100 overfund added to the rate schedule. It stated in the email that this overfund was added to the Business's "offset. Florida and non-Florida." On information and belief, this was not true because it was for EFG legal liability.

76.     On March 12, 2015, Matt O'Brien sent an email to Defendant Fox, which was a screenshot of the overfunds. There was a total overfund of $225, of which of $125 was the additional reserve to be held by EGS as needed, and $100 to reserve for EFG liability.

77.     Defendant EGS had the sole responsibility for providing the Customer Data to the Business.  Plaintiff played no role in that part.[19]

78.     The EFG liability was a sole liability of Defendants O'Brien, Fox, BI and EGS and not the Business because it was Defendant EGS' sole responsibility to provide the Customer data to the Business, not Plaintiff's, and because Defendants O'Brien, Fox, BI and EGS

---

[19] Defendants' EGS000007- EGS000008.

misappropriated the Customer Data in order to provide it to the business. On information and belief, Defendant's increased or made changes to the Overfunds between 2015-2018 without telling Plaintiff in order to pay for the legal liability of misappropriating EFG's customer data.

79.     Defendant EGS kept these overfunds secret from Plaintiff (the "Secret Overfund").

80.     On March 8, 2018, Moxy first notified Plaintiff of the Secret Overfund, and as of that date, it was in the amount of $370 for each TechChoice and Omega VSC sold by the Business.

81.     The Secret Overfund was Net Revenue of the Business for the purpose of calculating the 49% distribution of Plaintiff.

82.     Defendant EGS' failure to include the Secret Overfund in the calculation of Net Revenue of the Business was in breach of the Management Agreement.

83.     Pursuant to Defendant EVS calculations, the Secret Overfund as reflected in the financial statements of the Business was in the amounts of $55,197.30 for March 31, 2016, $53,128.91 for June 30, 2016, $234,339.01 for December 31, 2016, and $3,750.00 for February 28, 2018, totaling $346,415.22, 49% of which was never paid to Plaintiff.

84.     After the Secret Overfund was disclosed to Plaintiff on March 8, 2018, Defendant EVS stopped accounting for it in the financial statements of the Business as of February 28, 2018.[20]

85.     Because overfunds are only known to Defendants and Moxy, Defendant EVS may not be reporting all overfunds of TechChoice and Omega VSCs of the Business. Additional overfunds are also Net Revenues of the Business for the purpose of calculating the 49% distribution to Plaintiff.

---

[20] Exhibit G.

86.     The exact amount of damages sustained by Plaintiff for the failure to add overfunds to Net Revenues of the Business for the calculation of the 49% distribution payable to Plaintiff will be proven at trial.

## Inconsistent Revenue Figures

87.     Plaintiff was entitled to receive 49% of the Net Income of the Business.

88.     But Defendant EVS did not report the Net Income of Business consistently to Plaintiff.

89.     For example, Net Income of the Business for 2017 is stated as $1,725,079 on some of the financial statements and as $1,975,695 on some of the EGS funding reports.

90.     Another example, Net Income of the Business for 2018 is stated as $768,764 on some of the financial statements and as $529,496 on some of the EGS Funding Reports.

91.     The exact amount of damages sustained by Plaintiff for Defendant EVS' failure to calculate the Net Income of the Business accurately and consistently for the calculation of the 49% distribution payable to Plaintiff will be proven at trial.

## Payroll Expenses and Operating Expenses

92.     Plaintiff is entitled to the deduction of only the actual payroll expenses and operating expenses of the Business for the calculation the 49% distribution payable to Plaintiff.

93.     The legal expenses deducted from the Net Revenue of the Business for Defendant EGS' misappropriation of the Customer Data is the sole liability of Defendant EGS, not an operating expense of the Business, and was deducted to offset Defendants BI,  EGS, O'Brien and Fox's legal liability to EFG.

94.     The exact amount of damages sustained for Defendants deduction of legal expenses for EFG lawsuit from Net Revenue for the calculation of the 49% distribution to Plaintiff will be proven at trial.

95.     The Business is in effect a joint venture in which the profits (not losses) are distributed 51% to Defendant EGS and 49% to Plaintiff.

96.     As such, there is no provision in the Management Agreement for any fee-based compensation payable to any of the Defendants for the management of the Business.

97.     For example, pursuant to Defendant EVS calculations, either $347,997.41 or $355,311.25 was deducted as operating expenses of the Business in 2018 as "Management Fees Expense" in breach of the Management Agreement.

98.     Moreover, pursuant to Defendant EVS calculations, another section of the financial statements states that this "Management Fee Expense" is an operating expense of the Business for 2018 was $2,860.11.

99.     The exact amount of damages sustained by Plaintiff for Defendants deduction of any fee-based compensation paid to any of the Defendants from the Net Revenue of the Business for the calculation of the 49% distribution payable to Plaintiff will be proven at trial.

100.     Pursuant to Defendant EVS calculations, Defendants deducted $144,442.00 for undocumented "unbilled expenses" of the Business for 2016 and $335,628.00 for undocumented "unbilled expenses" for the Business in 2017.

101.     Undocumented "unbilled expenses" cannot be deducted as operating expenses in accordance with GAAP.

102.    The exact amount of damages sustained by Plaintiff for Defendants deduction of undocumented "unbilled expenses" from Net Revenue for the calculation of the 49% distribution payable to Plaintiff will be proven at trial.

103.    As calculated by Defendant EVS, payroll and related employee expenses are widely inconsistent as stated in the EGS Funding Reports as opposed to the financial statements for each of 2016, 2017, and 2018 provided to Plaintiff.

104.    Only the exact amount of payroll and related employee expenses of the Business may be deducted from Net Revenue for the calculation of the 49% distribution payable to Plaintiff.

105.    The exact amount of damages sustained by Plaintiff for Defendants' improper deduction of the payroll and employment expenses and overhead expenses from Net Revenue for the calculation of the 49% distribution payable to Plaintiff will be proven at trial.

### Reasonable Reserves

106.    There is a basic accounting concept of determining contract reserves for contracts if the future costs of the contracts could exceed future contract revenues.

107.    These contract reserves are subject to reasonable actuarial discretion based on different conditions in a business from time to time when the contract is booked.

108.    The Management Agreement provides Defendant EGS with this reasonable discretion to determine contract reserves based on differing business conditions, such as the amount and timing of cancellations.

109.    The Management Agreement does not provide that Defendant EGS can change the methodology of calculating contract reserves for the purpose of depriving Plaintiff of the 49% distribution.

110.   The Management Agreement does not provide Defendant EGS with the reasonable discretion to add any future obligation it desires to the reserves of the Business that are neither contract reserves nor obligations of the Business, such as for legal expenses of Defendants for the misappropriation of the Customer Data supplied by EFG.

111.   TechChoice and Omega VSCs are contracts in which contract reserves are appropriate at the time the VSC is booked because the Business can incur costs in excess of future revenues of the VSC by reason of cancellations.

112.   Any reserves taken by Defendants BI and EGS that are not contract reserves are not reasonable.

113.   Plaintiff is entitled to 49% of excess reserves.

114.   Pursuant to Defendant EVS calculations, 49% of excess reserves were distributed to Plaintiff in 2015 and 2016.

115.   <u>No excess reserves distributions were made to Plaintiff for 2017, 2018 and 2019.</u>

116.   On March 1, 2019, Defendant Fox sent an email to Plaintiff to schedule a meeting to review the current state of the Business, including the amount of excess reserves as of the end of 2018 and stated that "EFG never returned premium to us causing a deficit in the position."

117.   Any EFG obligation for returned premium was not chargeable to the reserves.

118.   Upon information and belief, it was either offset by Defendants' payment to EFG to settle the EFG lawsuit, or not due, and not attributable to plaintiff, pursuant to the January 2015 Seller Agreement or the October 2015 Seller Agreement.

119.   On March 12, 2019, Defendant Fox sent an email to Plaintiff to state "Bill (CFO) & Andrew will have all the requested reserve & financial reports finished up this morning and I will have them to you by noon today for your review."

20

120. Also, on March 12, 2019, Defendant Fox emailed to Plaintiff a cumulative Reserve Report for calendar years ending 2015, 2016, 2017, and 2018 as well as a cumulative Profit & Loss statement for calendar years ending 2015, 2016, 2017, and 2018.

121. On information and belief, Defendant EVS overstated expenses and reserves to manipulate the reserve report to make it appear that there was a negative balance of reserves as of December 31, 2018 to avoid paying the 49% payable to Plaintiff by, *inter alia,* changing the methodology of calculating contract reserves for the sole purpose of the application against the reserves of a hold back for future cancellations for VSCs, the application against the reserves of an EFG liability for return premiums, the application against the reserves for EFG lawsuit expenses, and the application against the reserves of undocumented "unbilled expenses."

122. Pursuant to Defendant EVS calculations, total cash on hand of the Business as of December 21, 2018, was in the amount of $3,235,543.67.

123. The exact amount of damages sustained by Plaintiff for this improper manipulation of the excess reserve balance for the calculation of the 49% distribution payable to Plaintiff will be proven at trial.

### Weekly EGS Funding Reports

124. From March 23, 2015, to October 1, 2019, a funding report (the "EGS Funding Reports") was prepared on a weekly basis. Each weekly EGS Funding Report was prepared for the sole purpose of calculating the amount of the 49% distribution to be made to Plaintiff on a weekly basis.

125. Also, from March 23, 2015, to October 1, 2019, Defendant Fox verified on a weekly basis the weekly 49% distribution to be made to Plaintiff and authorized the payment of the weekly 49% distribution to Plaintiff.

126.    Each week from March 23, 2015, through October 2, 2017, Defendant Fox emailed a weekly EGS Funding Report to Dennis Phelps, president of Plaintiff.

127.    Each week from October 12, 2017, through October 1, 2019, at the direction of Defendant Fox, Shawna Killian emailed an EGS Funding Report to Dennis Phelps, president of Plaintiff.

128.    Each week from March 23, 2015, through October 1, 2019, as authorized by Defendant Fox, a weekly distribution was made to Plaintiff in the amount of the corresponding weekly EGS Funding Report via wire transfer to Plaintiff's bank account at Commerce Bank branch in Belleville, Illinois.

129.    Each EGS Funding Report emailed to Dennis Phelps, president of Plaintiff, from March 12, 2015, through March 8, 2018, was fraudulent because each failed to account for all Net Revenue of the Business for said week.

130.    Each weekly payment from March 23, 2015, through March 8, 2018, was also fraudulent because it failed to account for all the Net Revenue of the Business for said week.

131.    From February 20, 2015, through October 25, 2019, Plaintiff fully performed its duties and obligations under the Management Agreement, which culminated in Plaintiff renewing approximately 10,000 expired or expiring VSCs that generated millions of dollars in Net Revenue for the Business.

## The Misappropriation of the Trade Secret Customer Data

132.    On February 7, 2017, EFG terminated the 2008 Private Label Agreement and the 2009 Seller Agreement pursuant to the "for cause" provisions of each agreement. The reasons set forth in the termination notice were that EFG provided the Confidential Customer Data to Defendant BI for the sale and marketing of EFG administered programs (TechChoice VSCs), yet

Defendant BI used it to solicit EFG customers to switch to competing VSCs (Omega VSCs) that are administered by a competing Administrator (EVG). A copy of the termination letter is attached hereto as <u>Exhibit H</u> and incorporated herein by reference.

133.    Also on this date, EFG filed a lawsuit in Dallas County, Texas against, *inter alia*, Defendant BI with respect to these claims.[21]   A copy of this lawsuit is attached hereto as <u>Exhibit I</u> and incorporated herein by reference.

134.    On April 21, 2017, Defendants sent a total of 6,907 "pink notices" to EFG customers.[22]

135.    Defendants sold fifty (50) VSCs out of the 6,907 mailings, of which forty-four (44) of them were sold to EFG customers with *active* TechChoice VSCs administered by EFG.[23]

136.    On April 25, 2017, EFG (through counsel) sent a "cease and desist" letter to Defendants (through counsel) regarding pink letters Defendant BI sent to EFG customers with *unexpired* month-to-month TechChoice VSCs administered by EFG to terminate those contracts and enter into new Omega VSCs administered by EVG. A copy of this letter is attached hereto as <u>Exhibit J</u> and incorporated herein by reference.

137.    Upon information and belief, EFG provided the Customer Data to National Vehicle Protection Service because it had terminated its agreements with Defendants BI and EGS.

138.    On June 5, 2017, Defendants BI, EGS, EFS, and EGV filed a lawsuit in The Eleventh Judicial District, State of Missouri, against National Vehicle Protection Services, sworn to by Defendant O'Brien, which asserted that  Defendants BI and EGS owned the Trade Secret

---

[21] *Enterprise Financial, Group, Incorporated v. Barantas, Incorporated, Patrick J. O'Brien, Brian P. Fox, and EGS Administration, LLC*; Cause No. DC-17-01503, pending in the 191st District Court of Dallas County, Texas.
[22] Affidavit of Brian Fox, *Enterprise Financial Group Inc. v. Barantas Incorporated, et al.*, Trial Court Cause No. DC-17-01503, 191st Judicial District Court, Dallas County, Texas.
[23] *Id.*

Customer Data, that EFG was merely storing it for Defendants BI and EGS, that it qualified as trade secret under §417.453(4), RSMo, that National Vehicle Protection Services' possession and use of the Trade Secret Customer Data constituted misappropriation of Defendants BI and EGS' trade secrets under §417.453(2), RSMo. A copy of this lawsuit is attached as Exhibit K hereto and incorporated herein by reference.

139.    On August 17, 2017, EFG filed a second amended complaint ("Second Amended Complaint") that incorporated the claims regarding the "pink notices" that alleged, among other things, (i) breach of the 2008 Private Label Agreement by soliciting or attempting to solicit EFGs *existing accounts*; (ii) breach of the 2009 Seller Agreement by using EFG confidential customer information without EFG's consent to market and sell Omega VSCs to EFG *existing and expiring* customers, for the benefit of Defendant BI and to the detriment of EFG; (iii) misappropriation of trade secrets, conspiracy to misappropriate trade secrets, and tortious interference with contracts.[24] A copy of the Second Amended Complaint is attached hereto as Exhibit L and incorporated herein by reference.

140.    On or about September 27, 2018, the parties settled the Second Amended Complaint pursuant to which Defendants BI, EGS, Brien and Fox paid EFG up to $3,000,000, upon information and belief.

141.    Also, on September 27, 2018, an order was entered dismissing the Second Amended Complaint with prejudice.

**The Fraudulent Overstatement of Expenses and Reserves.**

142.    On March 1, 2019, Defendant Fox sent an email to Plaintiff to schedule a meeting to review the current state of the Business, including the amount of excess reserves as of the end of 2018 and stated that "EFG never returned premium to us causing a deficit in the position."

---

[24] *Id.*

143.    Any EFG obligation for returned premium was offset by Defendants' payment to EFG to settle the EFG lawsuit.

144.    On March 12, 2019, Defendant Fox sent an email to Plaintiff to state "Bill (CFO) & Andrew will have all the requested reserve & financial reports finished up this morning and I will have them to you by noon today for your review."

145.    Also, on March 12, 2019, Defendant Fox emailed to Plaintiff a cumulative Reserve Report for calendar years ending 2015, 2016, 2017, and 2018 as well as a cumulative Profit & Loss statement for calendar years ending 2015, 2016, 2017, and 2018.

146.    Defendant EVS manipulated the reserve report by fraudulently overstating expenses and reserves to make it appear that there was a negative balance of reserves as of December 31, 2018 to avoid paying the 49% payable to Plaintiff by, *inter alia,* changing the methodology of calculating contract reserves for the sole purpose of the application against the reserves of a hold back for future cancellations for VSCs, the application against the reserves of an EFG liability for return premiums, the application against the reserves for EFG lawsuit expenses, and the application against the reserves of undocumented "unbilled expenses."

147.    Pursuant to Defendant EVS calculations, total cash on hand of the Business as of December 21, 2018 was in the amount of $3,235,543.67, which upon information and belief, constituted Plaintiff's 49% of the reserves.

148.    The exact amount of damages sustained by Plaintiff for this improper manipulation of the excess reserve balance for the calculation of the 49% distribution payable to Plaintiff will be proven at trial.

149.    From February 20, 2015, through October 25, 2019, Plaintiff fully performed its duties and obligations under the Management Agreement, which culminated in Plaintiff

renewing approximately 10,000 expired or expiring VSCs that generated millions of dollars in Net Revenue for the Business.

## CAUSES OF ACTION

### COUNT I
Federal Civil RICO, 18 U.S.C. §1962(c)
(Against Defendants O'Brien and Fox)

150.    Plaintiff incorporates by this reference, as if the same were fully stated herein, each and every one of its allegations set forth above.

151.    The elements that are common in all RICO violations are: (i) a culpable person, who (ii) conducts (or acquires) an "enterprise" (iii) affecting interstate commerce (iv) through a "pattern" (v) of "racketeering activity" in which the plaintiff was injured "by reason of" the RICO violation.

152.    Plaintiff is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

153.    Each of Defendants O'Brien and Fox is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

154.    Each of Defendants O'Brien and Fox violated 18 U.S.C. § 1962(c) by the acts in the prior paragraphs, and as further described below.

155.    The Enterprise. The sellers of TechChoice and Omega VSCs in the Business, comprised of Defendants BI, EGS, O'Brien and Fox, form an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961 (4) and pursuant to *Boyle v. United States*, 556 U.S. 938, 129 S. Ct. 2237, 2244, 173 L. Ed. 1265 (2009).[25]

---

[25] "[A]n association in fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes."

26

156.    Each of Defendants O'Brien and Fox is a person distinct from the enterprise because the enterprise is an association in fact composed of four entities and a collective entity is something more than the members of which it is comprised.[26]

157.    The common or shared purpose of the enterprise was to sell Omega VSCs to Orphan Holders, using misappropriated Confidential Customer Data from EFG to identify the Orphan Holders, and to deprive Plaintiff of its 49% distributions from the Business to offset the enterprise's legal liability to EFG.

158.    These associates of the enterprise are related in that Defendant BI owns 55% of Defendant EVS, which is the sole member of Defendant EGS; Defendant O'Brien is the President of Defendants BI and EGS; and Defendant Fox is a manager of Defendant EGS and a vice president of Defendant EVG.

159.    Defendant O'Brien played a part in directing the enterprise's affairs by participating in the operations or management of the enterprise itself by (a) obtaining EFG's approval of Defendant EGS; (b) signing the 2008 Private Label Agreement, the 2009 Seller Agreement, the January 2015 Seller Agreement, and the October 2015 Seller Agreement; and (c) acquiring the Customer Data for the particular purposes of renewing TechChoice VSCs for Orphan Holders.

160.    Defendant Fox played a part in directing the enterprise's affairs by participating in the operations or management of the enterprise itself by (a) directing the establishment of  the Secret Overfund; (b) directing the calculation and transmission of the EGS Funding Reports to Plaintiff; (c) by directing the wire transfers of the weekly funding to Plaintiff;  (d) by directing the misappropriation of the Trade Secret Customer Data from EFG;  any (e) by directing the overstatement of reserves and expenses.

---

[26] *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986, 995 (8th Cir. 1989).

161.    The enterprise has continued in structure and personnel from March 12, 2015, when Defendant Fox directed the establishment of the Secret Overfund, continued weekly through March 8, 2018, during which time Defendant Fox directed the calculation and transmission of weekly EGS Funding Reports and funding to Plaintiff, continued through April 21, 2017, when Defendant Fox misappropriated EFG's Customer Data, continued through June 5, 2017 when Defendant O'Brien misappropriated EFG's Customer Data, continued through September 27, 2018, when Defendants settled EFG's misappropriation of trade secrets lawsuit, and ended on March 12, 2019, when Defendants wired fraudulent financial statements to Plaintiff that overstated reserves and expenses.

162.    The enterprise has an ascertainable structure distinct from that inherent in the pattern of racketeering activity because it was involved legitimate businesses, including procuring agreements with vehicle dealerships and independent call centers for the sale of TechChoice VSCs for EFG to administer pursuant to the 2008 Private Label Agreement, and soliciting renewals and sales of TechChoice VSCs administered by EFG pursuant to the 2009 Seller Agreement, the January 2015 Seller Agreement, and the October 2015 Seller Agreement, respectively.

163.    Alternatively, for the reasons ser forth above, Defendant BI constitutes a separate enterprise within the meaning of 18 U.S.C. § 1961 (4).

164.    Alternatively, for the reasons ser forth above, Defendant EGS constitutes a separate enterprise within the meaning of 18 U.S.C. § 1961 (4).

165.    Each enterprise has engaged in, and their activities have affected, interstate commerce because it sells TechChoice and Omega VSCs across state lines.

166.    Pattern of Racketeering Activity.  Defendants O'Brien and Fox, each of whom are persons associated with or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meanings of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by Defendants O'Brien's and Fox's regular and repeated uses of the facilities and services of the enterprise.  Defendants O'Brien and Fox had the specific intent to engage in the substantive RICO violations alleged herein.

167.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in §§ 1961(1), as more specifically alleged below. Defendants O'Brien and Fox committed at least two such acts or else aided and abetted such acts.

168.    The acts of racketeering activity were not isolated, but rather acts of Defendants O'Brien and Fox were related in that they had the same or similar purpose and result. Further, the acts of racketeering by Defendants O'Brien and Fox have been continuous over a period of four (4) years. There was a close-ended scheme, consisting of related predicate acts repeated during the 4-year period.

169.    The association-in-fact enterprise and the alternative enterprises, as alleged herein were not limited to the predicate acts and extended beyond the racketeering activity.  Rather, they existed separate and apart from the racketeering activity for the legitimate business purpose of renewing expired or expiring VSCs for Orphan Holders. Defendants O'Brien and Fox have had, and do have, legitimate business plans outside of the pattern of racketeering activity.

170.    Plaintiff specifically alleges that Defendants O'Brien and Fox also participated in the operation and management of the association-in-fact enterprise and the alternative enterprises

alleged herein by engaging in and by overseeing and coordinating the commission of multiple acts of racketeering as described below.

171.   Predicate Act: Misappropriation of Trade Secrets in Violation of 18 U.S.C. § 1832.  Defendant O'Brien committed indictable offenses under 18 U.S.C. § 1832 in that he  (a) with the intent to convert a trade secret, (b) that is related to a product or service used in interstate or foreign commerce, (c)  to the economic benefit of Defendants BI and EGS, (d) and intending or knowing that the offense will injure EFG, the owner of the trade secret, (e) knowingly, and without authorization appropriated the information.

172.   Specifically, Defendant O'Brien knew that on February 7, 2017,  EFG terminated the 2008 Private Label Agreement, the 2009 Seller Agreement, the January 2015 Seller Agreement, and the October 2015 Seller Agreement with Defendants BI and EGS, respectively, and further that EGS did not own the Customer Data to be used to solicit Orphan Holders to renew TechChoice VSCs; on June 5, 2017, Defendant O'Brien nonetheless appropriated the Customer Data in violation of 18 U.S.C § 1832 when he swore to a verified petition that asserted Defendants BI and EGS owned the Customer Data, that EFG was merely storing it for Defendants BI and EGS, that it qualified as trade secret under §417.453(4), RSMo, and that NVPS' possession and use of the Customer Data constituted misappropriation of Defendants BI and EGS' trade secrets under  §417.453(2), RSMo.

173.   On information and belief, Defendant O'Brien's objective was to divert funds to his own benefit from the renewal of TechChoice VSCs by NVPS to Orphan Holders that would have been paid to EFG.

174.    Upon information and belief Defendants O'Brien, Fox, BI and EGS paid damages to EFG in an amount up to $3,000,000 for these offenses with the money extracted from Plaintiff's 49% management fee.

175.    <u>Predicate Act: Misappropriation of Trade Secrets in Violation of 18 U.S.C. § 1832</u>.  Defendant Fox committed indictable offenses under 18 U.S.C. § 1832 in that he  (a) with the intent to convert a trade secret, that is related to a product or service used in interstate or foreign commerce, to the economic benefit of Defendants BI and EGS, and intending or knowing that the offense will injure EFG, the owner of the trade secret, knowingly, and without authorization appropriated the information.

176.    Specifically, on February 7, 2017, Defendant Fox knew that the appropriation of the Customer Data to be used to solicit Orphan Holders to switch to competing Omega VSCs was not authorized by EFG; on April 21, 2017, Defendant Fox appropriated the Customer Data in violations of 18 U.S.C § 1832 when he nonetheless sent a total of 6,907 "pink notices" to solicit Orphan Holders to switch to competing Omega VSCs; Defendants BI and EGS sold fifty (50) Omega VSCs to Orphan Holders, forty four (44) to Orphan Holders with active TechChoice VSCs administered by EFG.

177.    In the alternative, each individual use of the Customer Data to solicit 6,907 Orphan Holders to switch to competing Omega VSCs is a separate predicate act.

178.    In the alternative, each individual use of the Customer Data to sell Omega VSCs to Orphan Holders is a separate predicate act.

179.    Defendant Fox's objective was to divert funds to his own benefit from the sale of Omega VSCs to Orphan Holders that would have been paid to EFG.

180.   On information and belief, Defendants O'Brien, Fox, BI and EGS paid damages to EFG in an amount up to $3,000,000 for these offenses, with the money coming from Plaintiff's 49% management fee.

181.   <u>Predicate Act: Use of Wires to Defraud Plaintiff in Violation of 18 U.S.C. § 1343</u>. Defendant Fox committed indictable offenses under <u>18 U.S.C. § 1343</u> in that he having (a) devised or intended to devise a scheme or artifice (b) to defraud Plaintiff or to obtain money from Plaintiff (c) by means of false or fraudulent pretenses, representations or promises, (d) transmitted or caused to be transmitted, (e) by means of wire, radio, or television communication, (f) in interstate or foreign commerce, (g) any writings, signs, signals, pictures, or sounds, (h) for the purpose of executing such scheme. These acts were done intentionally and knowingly with the specific intent to advance Defendant Fox's scheme or artifice.

182.   Specifically, on March 12, 2015, Defendant Fox devised a scheme to defraud Plaintiff of its 49% of distributions pursuant to the Management Agreement when he directed or in the alternative was informed of the establishment of the Secret Overfund; on April 2, 2015, Defendant Fox misrepresented to Plaintiff by email in which he attached a draft Management Agreement to be reviewed that "the management fee for Paragon is 49% of net revenue, less all overhead costs of operating the business;" on February 26, 2016, Defendant Fox misrepresented to Plaintiff by email in which he attached the Management Agreement to be executed that "the management fee for paragon is 49% of net revenue, less all overhead costs of operating the business;" Defendant Fox repeatedly emailed or caused to be emailed false EGS Funding Reports to Plaintiff, on a weekly basis, including one on March 27, 2015 in the amount of $15,953.41 and continuing weekly thereafter including one on March 2, 2018 in the amount of $13,249.37; Defendant Fox repeatedly transmitted or caused to be transmitted a weekly payment

to be made to Plaintiff in the amount of the corresponding weekly false EGS Funding Report via wire transfer to Plaintiff's bank account at Commerce Bank branch in Belleville, Illinois, to include the wire transfer on March 27, 2015 in the amount of $15,953.41 and every week thereafter to include the wire transfer on March 1, 2018 in the amount of $13,249.37; and on March 12, 2019, Defendant caused the expenses and reserves of the Business to be overstated and caused false financial statements to be emailed to Plaintiff. These acts were done intentionally and knowingly with the specific intent to advance Defendant Fox's scheme or artifice.

183.     In the alternative, each email of a fraudulent EGS Funding Report to Plaintiff and each wire transfer based on a fraudulent EGS Funding Report in furtherance of Defendant Fox's scheme is a separate predicate act.

184.     Defendant Fox's objective was to offset Defendants BI, EGS, O'Brien's and Fox's joint and several liability to EFG by depriving Plaintiff of its 49% distribution.

185.     Plaintiff has been damaged as a direct and proximate result of Defendant Fox's conduct and participation in such enterprise.

186.     <u>Continuity of Conduct</u>. Defendant Fox's violations of federal law as set forth herein, each of which directly and proximately injured Plaintiff, constituted a continuous course of conduct spanning a period of four (4) years, which was intended to obtain money from more than one victim through false pretenses, false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a closed-in pattern of racketeering activity under <u>18 U.S.C. §§ 1961(1)</u> and <u>(5)</u>.

187.     Defendant Fox has conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein violation of 18 U.S.C § 1962(c).

188.     The unlawful actions of Defendant Fox have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business. Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars deprived from it to offset Defendants BI, EGS, O'Brien's and Fox's joint and several liability to EFG.

189.     Plaintiff has been harmed by this conduct.

190.     Plaintiff accordingly seeks an award of three times the damages it sustained, the recovery of reasonable attorney' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## COUNT II
### Breach of Contract
(Against Defendant EGS)

191.     Plaintiff incorporates by reference each and every preceding paragraphs of this Second Amended Complaint as if fully set forth herein.

192.     Under Illinois law, to establish a breach of contract, the plaintiff must show (a) the existence of a valid and enforceable contract, (b) performance of the contract by the plaintiff, (c) breach of the contract by the defendant, and (d) that the defendant's breach resulted in damages. *Horwitz v. Sonnenschein, Nath and Rosenthal*, LLP, 926 N.E.2d 934, 942 (Ill. App. Ct. 2010); *Unterschuetz v. City of Chicago*, 346 Ill. App. 3d 65, 69 (Ill. Ct. App. 2004).

193.     The Management Agreement between Plaintiff and Defendant EGS Administration, LLC f/k/a/ Ensurety Group Services, LLC is a valid and enforceable contract as set forth on Exhibit F hereto.

194.    Plaintiff fully performed its obligations pursuant to the Management Agreement as set forth in the paragraphs above.

195.    Defendant EGS breached the Management Agreement by:

(a)    Failing to include the administration revenue for EVG administration of Omega VSCs sold by the Business in the calculation of calculating Net Revenue;

(b)    Failing to include the administration revenue for EVG administration of Omega "M2M" VSCs sold by the Business in the calculation of Net Revenue;

(c)    Making intercompany transfers to EVG that do not correlate to the funding reports as administrative revenue and then deducting those transfers from Net Revenue;

(d)    Failing include overfunds, including the Secret Overfund, in the calculation of Net Revenue;

(e)    Failing to accurately calculate Net Income of the Business;

(f)    Overstating the operating expenses and reserves of the Business;

(g)    Deducting expenses to defend the EFG lawsuit from the Net Revenue of the Business;

(h)    Deducting fee-based management fee expenses from the Net Revenue of the Business;

(i)    Deducting undocumented "unbilled expenses" from the Net Revenue of the Business;

(j)    Failure to accurately calculate Payroll Expense of the Business;

(k) Changing the methodology for calculating contract reserves for the TechChoice and Omega VSCs for the purpose of reducing Plaintiff's 49% distribution of reserves to zero;

(l) Deducting reserves other than reasonable contract reserves from the Net revenue of the Business;

(m) Failing to pay Plaintiff 49% of the Net Income of the Business.

196. As a direct and proximate result of Defendant EGS' breaches, Plaintiff suffered general damages in excess of seventy-five thousand dollars ($75,000.00), the exact amount of which will be proven at trial.

**COUNT III**
<u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>
(Against Defendant EGS)

197. Plaintiff incorporates by reference, as if the same were fully stated herein, each and every paragraph of its allegations set forth above.

198. Under Illinois law, a duty of good faith and fair dealing is implied in every contract. *Spadoni v. United Airlines, Inc.*, <u>47 N.E.3d 1152, 1159</u> (Ill. App. Ct. 1st Dist. 2015); *Martindell v. Lake Shore National Bank*, <u>154 N.E. 2d 683, 690</u> (Ill. 1958).

199. Under Illinois law, where a contract specifically vests one of the parties with broad discretion in performing a term of a contract, the covenant of good faith and fair dealing requires that discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. *Mid-West Energy Consultants, Inc. v. Covenant Home, Inc.*, <u>352 Ill. App. 3d 160, 165</u> (Ill. Ct. App. 2004).

200.    A duty of good faith and fair dealing is implied in the Management Agreement as set forth on Exhibit F hereto.

201.    Plaintiff has fully performed the Management Agreement.

202.    The Management Agreement vests Defendant EGS with broad discretion in calculating Net Revenue, Net Income, and Reserves for the purpose of calculating the "management fee" payable to Plaintiff.

203.    Defendant EGS breached its duty of good faith and fair dealing by:

(a)     Failing to include the administration revenue for EVG administration of Omega VSCs sold by the Business in the calculation of calculating Net Revenue;

(b)     Failing to include the administration revenue for EVG administration of Omega "M2M" VSCs sold by the Business in the calculation of  Net Revenue;

(c)     Making intercompany transfers to EVG that do not correlate to the funding reports as administrative revenue and then deducting those transfers from Net Revenue;

(d)     Failing include overfunds, including the Secret Overfund, in the calculation of Net Revenue;

(e)      Failing to accurately calculate Net Income of the Business;

(f)     Overstating the operating expenses and reserves of the Business;

(g)     Deducting expenses to defend the EFG lawsuit from the Net Revenue of the Business;

(h)     Deducting fee-based management fee expenses from the Net Revenue of the Business;

(i)      Deducting undocumented "unbilled expenses" from the Net Revenue of the Business;

(j)       Failure to accurately calculate Payroll Expense of the Business;

(k)      Changing the methodology for calculating contract reserves for the TechChoice and Omega VSCs for the purpose of reducing Plaintiff's 49% distribution of reserves to zero;

(l)      Deducting reserves other than reasonable contract reserves from the Net revenue of the Business;

(m)      Failing to pay Plaintiff 49% of the Net Income of the Business.

204.    As a direct and proximate result of Defendant EGS' breaches, Plaintiff suffered general damages in excess of seventy-five thousand dollars ($75,000.00), the exact amount of which will be proven at trial.

**COUNT IV**
<u>Fraud</u>
(Against Defendant Fox)

205.    Plaintiff incorporates by reference, as if the same were fully stated herein, each and every paragraph of its allegations set forth above.

206.    Under Illinois law, the elements of common law fraud are: (a) a false statement of material fact; (b) defendant's knowledge that the statement was false; (c) defendant's intent that the statement induces the plaintiff to act; (d) plaintiff's reliance on the statement; and (e) plaintiff's damages resulting from reliance on the statement. *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 7 (Ill. Ct. App. 2001).

207.    On April 2, 2015, Defendant Fox made a statement to Dennis Phelps, president of Plaintiff, in the form of an email in which he attached a draft Management Agreement to manage

The Renewal Center, in which he stated: "the management fee for Paragon _**is**_ 49% of the net revenue, less all overhead costs of operating the business," or other similar statements to induce Plaintiff's conduct.

208.   On February 26, 2016, Defendant Fox made a statement to Dennis Fox, president of Plaintiff, in the form of an email in which he attached a Management Agreement to manage The Renewal Center to be signed, in which he stated: "the management fee for Paragon _**is**_ 49% of the net revenue, less all overhead costs of operating the business," or other similar statements to induce Plaintiff's conduct.

209.   From March 27, 2015, and continuing weekly thereafter to and including March 8, 2018, Defendant Fox made a statement to Dennis Phelps, president of Plaintiff, in the form of an EGS Funding Report, in which he purported the net revenue of the Business for that week.

210.   Each of these statements on April 2, 2015, and February 26, 2016, was false because as of the date of each such statement, the Management Fee was less than 49% because it did not include the Secret Overfund in the calculation of net revenue.

211.   Each EGS Funding Report from March 27, 2015, and continuing weekly thereafter to and including March 8, 2018, was false because the weekly net revenue of the Business was less than as stated because it did not include the Secret Overfund in the calculation of net revenue.

212.   These statements were material as they induced Plaintiff to renew and to continue to renew thousands of expired or near expiring TechChoice and Omega VSCs.

213.   Defendant Fox made these statements with the intent of harming Plaintiff or the reckless disregard for the trust of the misrepresentations.

214.    Defendant Fox knew these statements were false because on March 12, 2015, he approved the Secret Overfund.

215.    It was Defendant Fox's intent that the statements induce Plaintiff to renew and to continue to renew TechChoice and Omega VSCs on behalf of the Business.

216.    Plaintiff relied on the statements by renewing and continuing to renew TechChoice and Omega VSCs on behalf of the Business. Plaintiff's reliance was reasonable.

217.    As a direct and proximate result of Plaintiff's reliance on the statements, Plaintiff suffered general damages in excess of seventy-five thousand dollars (75,000.00), the exact amount of which will be proven at trial.

218.    The conduct of Defendant Fox in this case was fraudulent, intentional, willful and wanton, entitling Plaintiff to an award of punitive damages in an amount no less than $5,000,000.00.

**COUNT V**
<u>Negligent Misrepresentation</u>
(Against Defendant Fox)

219.     Plaintiff incorporates by this reference, as if the same were fully stated herein, each and every paragraph of its allegations set forth above.

220.    Under Illinois law, negligent misrepresentation consists of: (1) a false statement of a material fact; (2) carelessness or negligence in ascertaining the truth f the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance when the party making the statement is under a duty to communicate accurate information. *Cappiccioni v. Brennan Naperville, Inc*., <u>791 N.E. 2d 553, 562</u> (Ill. Ct. App. 2003).

221.    On April 2, 2015, Defendant Fox made a statement to Dennis Phelps, president of Plaintiff, in the form of an email in which he attached a draft Management Agreement to manage The Renewal Center, in which he stated: "the management fee for Paragon *is* 49% of the net revenue, less all overhead costs of operating the business," or other similar statements to induce Plaintiff's conduct.

222.    On February 26, 2016, Defendant Fox made a statement to Dennis Fox, president of Plaintiff, in the form of an email in which he attached a Management Agreement to manage The Renewal Center to be signed, in which he stated: "the management fee for Paragon *is* 49% of the net revenue, less all overhead costs of operating the business," or other similar statements to induce Plaintiff's conduct.

223.    From March 27, 2015, and continuing weekly thereafter to and including March 8, 2018, Defendant Fox made a statement to Dennis Phelps, president of Plaintiff, in the form of an EGS Funding Report, in which he stated the net revenue of the Business for that week.

224.    Each of these statements on April 2, 2015, and February 26, 2016, was false because as of the date of each such statement, the Management Fee was less than 49% because it did not include the Secret Overfund in the calculation of net revenue.

225.    Each EGS Funding Report from March 27, 2015, and continuing weekly thereafter to and including March 8, 2018, was false because the weekly net revenue of the Business was less than as stated because it did not include the Secret Overfund in the calculation of net revenue.

226.    These statements were material as they induced Plaintiff to renew and to continue to renew thousands of expired or near expiring TechChoice and Omega VSCs.

227.    Defendant Fox was careless or negligent in ascertaining the truths of the statements because on March 12, 2015, he approved the Secret Overfund.

228.    Defendant Fox was negligent in stating 49% because he knew it was less than 49% because he directed or in the alternative knew that the Secret Overfund was not included in the Net revenue of the Business.

229.    Defendant Fox made these statements recklessly or without regard for the truthfulness thereof such that it would shock the conscious.

230.    It was Defendant Fox's intent that the statements induce Plaintiff to renew and to continue to renew TechChoice and Omega VSCs on behalf of the Business.

231.    Defendant Fox had a duty to communicate accurate information to Plaintiff because he knew Plaintiff would rely on it by renewing and continuing to renew TechChoice and Omega VSCs on behalf of the Business.

232.    Plaintiff relied on the statements by renewing and continuing to renew TechChoice and Omega VSCs on behalf of the Business and accepting Defendants' accounting statements.

233.    As a direct and proximate result of Plaintiff's reliance on the statements, Plaintiff suffered general damages in excess of seventy-five thousand dollars (75,000.00), the exact amount of which will be proven at trial.

234.    Defendant Fox acted with such gross negligence as to indicate a wanton disregard of the rights of Plaintiff, entitling Plaintiff to an award of punitive damages in an amount no less than $5,000,000.00.

## COUNT VI
Conspiracy to Breach Contract
(Against Defendants EFS, EGS, EVS, EGV, BI, STS, O'Brien and Fox)

228. Plaintiff incorporates by this reference, as if the same were fully stated herein, each and every one of its allegations in each and every paragraph set forth above.

229. Under Illinois law, the elements of civil conspiracy are (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) the furtherance of which one of the conspirators committed an overt tortious or unlawful act. *Redelmann v. Clair Sprayway, Inc*., 874 N.E.2d 230, 241 (ILL. Ct. App 2007).

230.  By concerted action, each of the eight (8) Defendants combined for the unlawful purpose of breaching the Management Agreement with Plaintiff for the management of the Business in order to offset legal liabilities to EFG for the misappropriation of Customer Data or otherwise reduce payment to Plaintiff under the Management Agreement, pursuant to which (a) EFS' role was to fail to include its revenues in the Net Revenue of the Business to deprive Plaintiff of its 49% distribution; (b) EGV's role was to fail to include its revenues in the Net Revenue of the Business to deprive Plaintiff of its 49% distribution; (c) Defendants BI, EGS, O'Brien and Fox's roles were to  deduct legal expenses from the Net Revenue of the Business to cover their joint and several legal liability arising from their misappropriation Confidential Customer Data from EFG to deprive Plaintiff of its 49% distribution; (d) Defendant STS' role was to  fail to accurately calculate personnel and related expenses of the Business to deprive Plaintiff of its 49% distribution; and (e) Defendant EVS' role was to manipulate the financial statements of the Business to deprive Plaintiff of its 49% distribution.

231. In furtherance of the conspiracy, Defendant Fox committed the overt tortious act or unlawful act of making fraudulent and/or negligent misrepresentations to Plaintiff that its management fee is 49% of net revenue.

232. As a direct and proximate result of Defendants' conspiracy to breach the Management Agreement, Plaintiff suffered general damages in excess of seventy-five thousand dollars ($75,000.00), the exact amount of which will be proven at trial.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor against Defendants as set forth above in each respective Count, award statutory damages, compensatory damages, attorney's fees to the extent permitted by law, punitive damages so as to discourage Defendants from engaging in such conduct in the future, and such further relief in Plaintiff's favor as this Court deems just and proper under the circumstances.

Respectfully submitted,

COSGROVE LAW GROUP, LLC

/s/Charles M. Simpson
David B. Cosgrove, Fed# 162893
Charles M. Simpson, Fed# 66228MO
7722 Big Bend Boulevard
St. Louis, Missouri 63119
Telephone: (314) 563-2490
Facsimile: (314) 968-7371
E-mail:  dcosgrove@cosgrovelawllc.com
 msimpson@cosgrovelawllc.com

*Attorneys for Plaintiff Paragon Partners, Inc.*