# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| **PARAGON PARTNERS, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No: 4:20CV1069 HEA** |
| | ) |
| **EFS COMPANIES, LLC, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint for Failure to State a Claim upon which Relief can be Granted, [Doc. No. 42] and Plaintiff's Motion to Dismiss Defendants EGV Companies, Inc. and EGS Administration, LLC's Counterclaims, [Doc. No. 46]. The parties oppose the respective Motions.  For the reasons set forth below, the Motions are denied.

## Facts and Background[1]

Plaintiff's Second Amended Complaint alleges the following:

---

[1] The recitation of facts is set forth for the purposes of this Opinion only and in no way relieves the parties of the proof thereof in later proceedings.

Defendant Barantas Incorporated, ("BI"), is "a designer, marketer, and agent" of Vehicle Service Contracts, (VSC"). Among other products in its portfolio, Defendant BI designs and sells TechChoice VSCs and Omega VSCs.

Effective February 22, 2008, third-party Enterprise Financial Group, Inc. ("EFG") and Defendant BI entered into an Administrative Private Label Agreement ("2008 Private Label Agreement"). Pursuant to this agreement, Defendant BI's general responsibilities included procuring agreements with vehicle dealerships and independent call centers for the sale of TechChoice VSCs for EFG and to administer and provide other information, expertise, and assistance to EFG. EFG paid commissions to Defendant BI for the TechChoice VSCs administered by EFG that were sold by vehicle dealerships and independent call centers procured by Defendant BI, including Defendant EGS Administration, LLC, ("EGS").

Effective February 20, 2008, Moxy Solutions, Inc., a business engaged in providing software packages that includes a rating engine and provides fulfillment services for administrators and sellers in the VSC industry ("Moxy"), entered into an Administrative Services Agreement with EFG, pursuant to which Moxy agreed to electronically transmit the sales activity of EFG's call centers to EFG on a weekly basis and print and mail the completed VSC to customers, to include the

declaration page, policy language, and state addendums.  Plaintiff asserts that
Defendant O'Brien owns 20% - 25% of Moxy.

Effective October 1, 2009, EFG and Defendant BI entered into a second
agreement, this one being a Seller Agreement for Administrative Services (the
"2009 Seller Agreement"). Pursuant to this agreement, Defendant BI's general
duties were to solicit the sale of TechChoice VSCs administered by EFG to
customers, to set the total contract prices for those TechChoice VSCs, and to pay
EFG for its administration services for those TechChoice VSCs sold (the "Seller
Cost"). For each TechChoice or Omega VSC sold, Defendant BI received the bulk
of the total contract price. EFG administers all TechChoice VSCs pursuant to the
2008 Private Label Agreement and the 2009 Seller Agreement. As administrator
the services include, among others, underwriting and claims adjustment. Between
approximately 2008 and 2017, Defendant BI sold thousands of TechChoice VSCs
to consumers through various call centers, including Defendant EGS. Some of
these call centers went out of business, however, leaving Orphan Holders without a
customer service representative or a seller to remarket and renew expired or
expiring TechChoice VSCs to them.

From 2009 through 2015, Defendant O'Brien received production reports
from EFG showing the number of VSCs generated through the call centers

pursuant to which Defendant BI was receiving a commission pursuant to the 2008 Private Label Agreement and the 2009 Seller Agreement.

Starting in early 2015, Defendants O'Brien and Fox started asking for much more detailed confidential customer information from EFG, which included customer name; customer address; customer contact information; customer vehicle make, model, year, VIN, and mileage, and VSC term ("Customer Data"). EFG communicated this Customer Data to Defendants O'Brien and Fox for the sole purpose of providing customer service to Orphan Holders and renewing their TechChoice VSCs administered by EFG that had expired or were nearing expiration.

The Customer Data was confidential and proprietary, valuable, and difficult, if not impossible to duplicate. The Customer Data qualifies as a trade secret under § 417.453(4), RSMo.

Effective January 5, 2015, EFG as administrator and Defendant EGS as seller entered into a Seller Agreement for Administrative Service (the "January 2015 Seller Agreement") for the sale and administration of TechChoice VSCs only.

Effective October 13, 2015, EFG as administrator and Defendant EGS as seller entered into a Call Center Seller Agreement (the "October 2015 Seller Agreement") for the sale and administration of TechChoice VSCs only. Every sale

of a TechChoice or Omega VSC for this call center was sold exclusively by either

Defendant BI or Defendant EGS who, in each case, received the total

purchase price for the VSC sold.

On December 29, 2014, Defendant Fox formed Defendant EGS. Defendant

EGS was part of an independent call center ("TechChoice Services" a/k/a "The

Renewal Center") that also renewed TechChoice VSCs for Orphan Holders and to

sell Omega VSCs. Defendant BI continued to also sell both TechChoice and

Omega VSCs after the formation of Defendant EGS and through early 2017.

Defendant Ensurety Ventures ("EVS") formed Defendant EGV Companies

("EGV") on April 24, 2013, and Defendant BI formed Defendant EFS on April 1,

2014. Defendant EGV, inter alia, provides administration for Omega VSCs sold by

Defendant BI and Defendant EGS. As such, it functions in much of the same way

as EFG does with respect to TechChoice VSCs.

EGV earns administration revenues derived from the sale of Omega VSCs

for The Renewal Center in the same manner as administration revenues are earned

by third-party EFG for the sale of TechChoice VSCs. All Omega VSCs are

administered by Defendant EGV.

Defendants EGS and EGV are "sister" companies having the same owner,

Defendant EVS. Defendant EVS is the sole shareholder of Defendant EGV and the

sole member of Defendant EGS. Defendant O'Brien is the President of both

Defendants EGS and EGV and Plaintiff believes both Defendants EGS and EGV have the same other corporate officers.

Defendants EGS and EGV failed to maintain an arm's length relationship with respect to Defendant EFG's administration of Omega VSCs.  It is believed that Defendants EGS and EGV commingle funds through a series of intercompany loans going back and forth between them derived from revenues of the Business. Plaintiff believes the employees of Defendant EGS and EGV are paid from a single payroll system provided by Defendant St. Aubrey Services, LLC ("STS"). Plaintiff alleges Defendants EGS and EGV are so inextricably linked that they cannot be considered separate entities.

Defendant EFS Companies, LLC ("EFS") provides administration for consumer financing of TechChoice and Omega VSCs. EFS earns administration revenue for consumer financing of both TechChoice and Omega VSCs for The Renewal Center.

Customers who finance their VSCs through EFS do so pursuant to a Payment Plan Agreement between the customer and the seller, either Defendant BI or Defendant EGS, on behalf of the administrator, either EFG or Defendant EGV, depending on whether a TechChoice or Omega VSC is financed. Defendant STS, inter alia, administrates human resources for The Renewal Center. Plaintiff believes Defendants BI, EGS, EGV, STS, EVS, and EFS,

allocate employee costs as well as related overhead expenses to The Renewal Center through Defendant STS for tasks including accounts payable, cancellations, payroll processing, employee benefit management, employee onboarding/ terminations, funding reports, financial statement preparation, various state/federal agency reporting, top level management, down-payment deposit reconciliations, cancellation trend reviews, and reserve reviews for all TechChoice and Omega VSCs sold by The Renewal Center. These overhead allocations for 2017 costs were in the amount of $57,842.83 and $50,542.24 for 2018.

On April 2, 2015, Defendant Fox emailed a draft Management Agreement between Defendant EGS and Plaintiff to Dennis Phelps, president of Plaintiff, for the operation of The Renewal Center, pursuant to which he represented to Mr. Phelps, "the management fee for Paragon is 49% of the net revenue, less all overhead costs of operating the business" (the "Management Agreement"). On February 26, 2016, Defendant Fox emailed the Management Agreement to Paragon a second time, this time to be signed, pursuant to which he again represented to Mr. Phelps, "the management fee for Paragon is 49% of the net revenue, less all overhead costs of operating the business."

Plaintiff signed the Management Agreement on or about February 26, 2016, and as instructed, used the U.S. mails to send it to Stephen J. Smith, counsel for Defendant Fox.

7

The purpose of the Management Agreement in effect was to form a joint venture-type arrangement between the Defendants and Plaintiff to share in the profits (not losses) derived from the operation of The Renewal Center a/k/a the "Business." An Exhibit A thereto was created but not completed. Consequently, no further detail was provided as to Plaintiff's duties.

Pursuant to the Management Agreement, Plaintiff was entitled to a "management fee" equal to 49% of the Net Income of the Business (the "Management Fee"). The "management fee" was a fee in name only because payments to Plaintiff thereunder were based entirely on a split of the Net Income (not the losses) of the Business and not fee based.

"Net Income" was defined as the net revenue of the Business on a cash basis (the "Net Revenue"), less all expenses of operating the Business, which included, but were not limited to: (i) all employee expenses to operate the Business, including but not limited to, wages, payroll taxes, and other benefits of staff employees (the "Payroll Expenses"); (ii) insurance, lease payments, utilities, professional fees, and other customary business expenses (the "Operating Expenses"); less (iii) a reasonable reserves for the Business, as calculated by the Defendants (the "Reserves").

Defendant EVS prepared the funding reports, financial statements, and reconciliations for the Business. Defendant EVS calculated Net Revenue as the

sum of Down Payments, Commission revenue, Cancel Reserve, and PIFs, minus Refunds.

Based on the EGS Funding Reports, Defendant EVS calculated "Commission Revenue" as net of the administration revenues for administration by third-party EFG and Defendant EGV. Based on the EGS Funding Reports, an allocation of personnel expenses for Defendant EGV administration is deducted from the Net Revenue of the Business. Based on the EGS Funding Reports, an allocation of overhead costs for Defendant EGV administration is deducted from the Net Revenue of the Business.

Plaintiff alleges Defendants EGS and EGV are so inextricably linked that they cannot be considered separate entities.

The deduction of the administration revenues for Defendant EGV administration of Omega VSCs sold by the Business was in breach of the Management Agreement. Pursuant to Defendant EVS calculations, the administration revenue for Defendant EVG administration of Omega VSCs that should have been included in the calculation of Net Revenue as reflected in the EGS Funding Reports of the Business was at least $1,488,931 for 2015, $2,040,446 for 2016, $4,065,085 for 2017, $1,675,000 for 2018, and $299,183 for 2019, totaling $9,568,645.

Pursuant to Defendant EVS calculations, the administration revenue for Defendant EGV administration of Omega "M2M" VSCs that should have been included in the calculation of Net Revenue as reflected in the EGS Funding Reports of the Business was at least $40,924 for 2016, $471,169.46 for 2017, $211,919.38 for 2018, and $24,439.44 for 2019, totaling $748,452.28.

Pursuant to Defendant EVS calculations, other transfers from the Business to Defendant EGV as reflected in the financial statements in the amounts of $754,029.98 for 2017, $1,240,000.00 for 2018, and $135,000.00 for 2019 do not correlate to the administration revenue as stated in the EGS Funding Reports.

An overfund is the amount that Defendant Fox added to rate schedules of the TechChoice and Omega VSCs as reported to Moxy. On February 27, 2015, Defendant Fox sent an email to Matt O'Brien directing him to set up an overfund of $125 to hold as an additional reserve for EGS as needed. On March 10, 2015, Matt O'Brien sent an email to Moxy to have an additional $100 overfund added to the rate schedule. It stated in the email that this overfund was added to the Business's "offset. Florida and non-Florida." Plaintiff believes this was not true because it was for EFG legal liability.

On March 12, 2015, Matt O'Brien sent an email to Defendant Fox, which was a screenshot of the overfunds. There was a total overfund of $225, of which of $125 was the additional reserve to be held by EGS as needed, and $100 to reserve

for EFG liability. Defendant EGS had the sole responsibility for providing the Customer Data to the Business. Plaintiff played no role in that part. The EFG liability was a sole liability of Defendants O'Brien, Fox, BI and EGS and not the Business because it was Defendant EGS' sole responsibility to provide the Customer data to the Business, not Plaintiff's, and because Defendants O'Brien, Fox, BI and EGS misappropriated the Customer Data in order to provide it to the business. Plaintiff believes Defendants increased or made changes to the Overfunds between 2015-2018 without telling Plaintiff in order to pay for the legal liability of misappropriating EFG's customer data. Defendant EGS kept these overfunds secret from Plaintiff (the "Secret Overfund").

On March 8, 2018, Moxy first notified Plaintiff of the Secret Overfund, and as of that date, it was in the amount of $370 for each TechChoice and Omega VSC sold by the Business. The Secret Overfund was Net Revenue of the Business for the purpose of calculating the 49% distribution of Plaintiff. Defendant EGS' failure to include the Secret Overfund in the calculation of Net Revenue of the Business was in breach of the Management Agreement.

Pursuant to Defendant EVS calculations, the Secret Overfund as reflected in the financial statements of the Business was in the amounts of $55,197.30 for March 31, 2016, $53,128.91 for June 30, 2016, $234,339.01 for December 31,

2016, and $3,750.00 for February 28, 2018, totaling $346,415.22, 49% of which was never paid to Plaintiff.

After the Secret Overfund was disclosed to Plaintiff on March 8, 2018, Defendant EVS stopped accounting for it in the financial statements of the Business as of February 28, 2018. Because overfunds are only known to Defendants and Moxy, Defendant EVS may not be reporting all overfunds of TechChoice and Omega VSCs of the Business. Additional overfunds are also Net Revenues of the Business for the purpose of calculating the 49% distribution to Plaintiff.

Plaintiff was entitled to receive 49% of the Net Income of the Business. Defendant EVS did not report the Net Income of Business consistently to Plaintiff. Plaintiff is entitled to the deduction of only the actual payroll expenses and operating expenses of the Business for the calculation of the 49% distribution payable to Plaintiff. The legal expenses deducted from the Net Revenue of the Business for Defendant EGS' misappropriation of the Customer Data is the sole liability of Defendant EGS, not an operating expense of the Business, and was deducted to offset Defendants BI, EGS, O'Brien and Fox's legal liability to EFG.

The Business is in effect a joint venture in which the profits (not losses) are distributed 51% to Defendant EGS and 49% to Plaintiff. As such, there is no

provision in the Management Agreement for any fee-based compensation payable to any of the Defendants for the management of the Business.

Pursuant to Defendant EVS calculations, another section of the financial statements states that this "Management Fee Expense" is an operating expense of the Business for 2018 was $2,860.11.

Pursuant to Defendant EVS calculations, Defendants deducted $144,442.00 for undocumented "unbilled expenses" of the Business for 2016 and $335,628.00 for undocumented "unbilled expenses" for the Business in 2017. Undocumented "unbilled expenses" cannot be deducted as operating expenses in accordance with GAAP.

As calculated by Defendant EVS, payroll and related employee expenses are widely inconsistent as stated in the EGS Funding Reports as opposed to the financial statements for each of 2016, 2017, and 2018 provided to Plaintiff. Only the exact amount of payroll and related employee expenses of the Business may be deducted from Net Revenue for the calculation of the 49% distribution payable to Plaintiff.

There is a basic accounting concept of determining contract reserves for contracts if the future costs of the contracts could exceed future contract revenues. These contract reserves are subject to reasonable actuarial discretion based on different conditions in a business from time to time when the contract is booked.

The Management Agreement provides Defendant EGS with this reasonable discretion to determine contract reserves based on differing business conditions, such as the amount and timing of cancellations. The Management Agreement does not provide that Defendant EGS can change the methodology of calculating contract reserves for the purpose of depriving Plaintiff of the 49% distribution. The Management Agreement does not provide Defendant EGS with the reasonable discretion to add any future obligation it desires to the reserves of the Business that are neither contract reserves nor obligations of the Business, such as for legal expenses of Defendants for the misappropriation of the Customer Data supplied by EFG.

TechChoice and Omega VSCs are contracts in which contract reserves are appropriate at the time the VSC is booked because the Business can incur costs in excess of future revenues of the VSC by reason of cancellations. Any reserves taken by Defendants BI and EGS that are not contract reserves are not reasonable. Plaintiff is entitled to 49% of excess reserves. Pursuant to Defendant EVS calculations, 49% of excess reserves were distributed to Plaintiff in 2015 and 2016. No excess reserves distributions were made to Plaintiff for 2017, 2018 and 2019.

On March 1, 2019, Defendant Fox sent an email to Plaintiff to schedule a meeting to review the current state of the Business, including the amount of excess reserves as of the end of 2018 and stated that "EFG never returned premium to us

14

causing a deficit in the position." Any EFG obligation for returned premium was not chargeable to the reserves. Plaintiff believes it was either offset by Defendants' payment to EFG to settle the EFG lawsuit, or not due, and not attributable to plaintiff, pursuant to the January 2015 Seller Agreement or the October 2015 Seller Agreement.

On March 12, 2019, Defendant Fox sent an email to Plaintiff to state "Bill (CFO) & Andrew will have all the requested reserve & financial reports finished up this morning and I will have them to you by noon today for your review." Also, on March 12, 2019, Defendant Fox emailed to Plaintiff a cumulative Reserve Report for calendar years ending 2015, 2016, 2017, and 2018 as well as a cumulative Profit & Loss statement for calendar years ending 2015, 2016, 2017, and 2018. Plaintiff believes Defendant EVS overstated expenses and reserves to manipulate the reserve report to make it appear that there was a negative balance of reserves as of December 31, 2018 to avoid paying the 49% payable to Plaintiff by, inter alia, changing the methodology of calculating contract reserves for the sole purpose of the application against the reserves of a hold back for future cancellations for VSCs, the application against the reserves of an EFG liability for return premiums, the application against the reserves for EFG lawsuit expenses, and the application against the reserves of undocumented "unbilled expenses."

Pursuant to Defendant EVS calculations, total cash on hand of the Business as of December 21, 2018, was in the amount of $3,235,543.67.

From March 23, 2015, to October 1, 2019, a funding report (the "EGS Funding Reports") was prepared on a weekly basis. Each weekly EGS Funding Report was prepared for the sole purpose of calculating the amount of the 49% distribution to be made to Plaintiff on a weekly basis. From March 23, 2015, to October 1, 2019, Defendant Fox verified on a weekly basis the weekly 49% distribution to be made to Plaintiff and authorized the payment of the weekly 49% distribution to Plaintiff.

Each week from March 23, 2015, through October 2, 2017, Defendant Fox emailed a weekly EGS Funding Report to Dennis Phelps, president of Plaintiff. Each week from October 12, 2017, through October 1, 2019, at the direction of Defendant Fox, Shawna Killian emailed an EGS Funding Report to Dennis Phelps, president of Plaintiff. Each week from March 23, 2015, through October 1, 2019, as authorized by Defendant Fox, a weekly distribution was made to Plaintiff in the amount of the corresponding weekly EGS Funding Report via wire transfer to Plaintiff's bank account at Commerce Bank branch in Belleville, Illinois.

Each EGS Funding Report emailed to Dennis Phelps, president of Plaintiff, from March 12, 2015, through March 8, 2018, was fraudulent because each failed to account for all Net Revenue of the Business for said week. Each weekly

16

payment from March 23, 2015, through March 8, 2018, was also fraudulent because it failed to account for all the Net Revenue of the Business for said week.

From February 20, 2015, through October 25, 2019, Plaintiff fully performed its duties and obligations under the Management Agreement, which culminated in Plaintiff renewing approximately 10,000 expired or expiring VSCs that generated millions of dollars in Net Revenue for the Business.

On February 7, 2017, EFG terminated the 2008 Private Label Agreement and the 2009 Seller Agreement pursuant to the "for cause" provisions of each agreement. The reasons set forth in the termination notice were that EFG provided the Confidential Customer Data to Defendant BI for the sale and marketing of EFG administered programs (TechChoice VSCs), yet Defendant BI used it to solicit EFG customers to switch to competing VSCs (Omega VSCs) that are administered by a competing Administrator (EVG). Also on this date, EFG filed a lawsuit in Dallas County, Texas against, inter alia, Defendant BI with respect to these claims.

On April 21, 2017, Defendants sent a total of 6,907 "pink notices" to EFG customers. Defendants sold fifty (50) VSCs out of the 6,907 mailings, of which forty-four (44) of them were sold to EFG customers with active TechChoice VSCs administered by EFG. On April 25, 2017, EFG (through counsel) sent a "cease and desist" letter to Defendants (through counsel) regarding pink letters Defendant BI sent to EFG customers with unexpired month-to-month TechChoice VSCs

administered by EFG to terminate those contracts and enter into new Omega VSCs administered by EVG. Plaintiff believes EFG provided the Customer Data to National Vehicle Protection Service because it had terminated its agreements with Defendants BI and EGS.

On June 5, 2017, Defendants BI, EGS, EFS, and EGV filed a lawsuit in The Eleventh Judicial District, State of Missouri, against National Vehicle Protection Services, sworn to by Defendant O'Brien, which asserted that Defendants BI and EGS owned the Trade Secret Customer Data, that EFG was merely storing it for Defendants BI and EGS, that it qualified as trade secret under §417.453(4), RSMo, that National Vehicle Protection Services' possession and use of the Trade Secret Customer Data constituted misappropriation of Defendants BI and EGS' trade secrets under §417.453(2), RSMo.

On August 17, 2017, EFG filed a second amended complaint ("Second Amended Complaint") that incorporated the claims regarding the "pink notices" that alleged, among other things, (i) breach of the 2008 Private Label Agreement by soliciting or attempting to solicit EFG's existing accounts; (ii) breach of the 2009 Seller Agreement by using EFG confidential customer information without EFG's consent to market and sell Omega VSCs to EFG existing and expiring customers, for the benefit of Defendant BI and to the detriment of EFG; (iii)

misappropriation of trade secrets, conspiracy to misappropriate trade secrets, and tortious interference with contracts.

On September 27, 2018, the parties settled the Second Amended Complaint pursuant to which Defendants BI, EGS, Brien and Fox paid EFG up to $3,000,000. An order was entered dismissing the Second Amended Complaint with prejudice that same day.

On March 1, 2019, Defendant Fox sent an email to Plaintiff to schedule a meeting to review the current state of the Business, including the amount of excess reserves as of the end of 2018 and stated that "EFG never returned premium to us causing a deficit in the position." Any EFG obligation for returned premium was offset by Defendants' payment to EFG to settle the EFG lawsuit.

On March 12, 2019, Defendant Fox sent an email to Plaintiff to state "Bill (CFO) & Andrew will have all the requested reserve & financial reports finished up this morning and I will have them to you by noon today for your review." Also, on March 12, 2019, Defendant Fox emailed to Plaintiff a cumulative Reserve Report for calendar years ending 2015, 2016, 2017, and 2018 as well as a cumulative Profit & Loss statement for calendar years ending 2015, 2016, 2017, and 2018. Defendant EVS manipulated the reserve report by fraudulently overstating expenses and reserves to make it appear that there was a negative balance of reserves as of December 31, 2018 to avoid paying the 49% payable to

Plaintiff by, inter alia, changing the methodology of calculating contract reserves for the sole purpose of the application against the reserves of a hold back for future cancellations for VSCs, the application against the reserves of an EFG liability for return premiums, the application against the reserves for EFG lawsuit expenses, and the application against the reserves of undocumented "unbilled expenses."

Pursuant to Defendant EVS calculations, total cash on hand of the Business as of December 21, 2018 was in the amount of $3,235,543.67, which Plaintiff believes, constituted Plaintiff's 49% of the reserves.

From February 20, 2015, through October 25, 2019, Plaintiff fully performed its duties and obligations under the Management Agreement, which culminated in Plaintiff renewing approximately 10,000 expired or expiring VSCs that generated millions of dollars in Net Revenue for the Business.

Plaintiff brings the following claims: Count I, Federal Civil RICO under 28 U.S.C. § 1962(c) against Defendants O'Brien and Fox.  In this Count, Plaintiff details the following:

The sellers of TechChoice and Omega VSCs in the Business, comprised of Defendants BI, EGS, O'Brien and Fox, form an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4). Each of Defendants O'Brien and Fox is a person distinct from the enterprise because the enterprise is an association in fact composed of four entities and a collective entity is something more than the

members of which it is comprised. The common or shared purpose of the

enterprise was to sell Omega VSCs to Orphan Holders, using misappropriated

Confidential Customer Data from EFG to identify the Orphan Holders, and to

deprive Plaintiff of its 49% distributions from the Business to offset the

enterprise's legal liability to EFG.

These associates of the enterprise are related in that Defendant BI owns 55%

of Defendant EVS, which is the sole member of Defendant EGS; Defendant

O'Brien is the President of Defendants BI and EGS; and Defendant Fox is a

manager of Defendant EGS and a vice president of Defendant EVG.

Defendant O'Brien played a part in directing the enterprise's affairs by

participating in the operations or management of the enterprise itself by (a)

obtaining EFG's approval of Defendant EGS; (b) signing the 2008 Private Label

Agreement, the 2009 Seller Agreement, the January 2015 Seller Agreement, and

the October 2015 Seller Agreement; and (c) acquiring the Customer Data for the

particular purposes of renewing TechChoice VSCs for Orphan Holders.

Defendant Fox played a part in directing the enterprise's affairs by

participating in the operations or management of the enterprise itself by (a)

directing the establishment of the Secret Overfund; (b) directing the calculation

and transmission of the EGS Funding Reports to Plaintiff; (c) by directing the wire

transfers of the weekly funding to Plaintiff; (d) by directing the misappropriation

21

of the Trade Secret Customer Data from EFG; any (e) by directing the overstatement of reserves and expenses.

The enterprise has continued in structure and personnel from March 12, 2015, when Defendant Fox directed the establishment of the Secret Overfund, continued weekly through March 8, 2018, during which time Defendant Fox directed the calculation and transmission of weekly EGS Funding Reports and funding to Plaintiff, continued through April 21, 2017, when Defendant Fox misappropriated EFG's Customer Data, continued through June 5, 2017 when Defendant O'Brien misappropriated EFG's Customer Data, continued through September 27, 2018, when Defendants settled EFG's misappropriation of trade secrets lawsuit, and ended on March 12, 2019, when Defendants wired fraudulent financial statements to Plaintiff that overstated reserves and expenses.

The enterprise has an ascertainable structure distinct from that inherent in the pattern of racketeering activity because it involved legitimate businesses, including procuring agreements with vehicle dealerships and independent call centers for the sale of TechChoice VSCs for EFG to administer pursuant to the 2008 Private Label Agreement, and soliciting renewals and sales of TechChoice VSCs administered by EFG pursuant to the 2009 Seller Agreement, the January 2015 Seller Agreement, and the October 2015 Seller Agreement, respectively.

Alternatively, for the reasons set forth above, Defendant BI constitutes a separate enterprise within the meaning of 18 U.S.C. § 1961 (4).

Alternatively, for the reasons ser forth above, Defendant EGS constitutes a separate enterprise within the meaning of 18 U.S.C. § 1961 (4). Each enterprise has engaged in, and their activities have affected, interstate commerce because it sells TechChoice and Omega VSCs across state lines.

Defendants O'Brien and Fox, each of whom are persons associated with or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meanings of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by Defendants O'Brien's and Fox's regular and repeated uses of the facilities and services of the enterprise. Defendants O'Brien and Fox had the specific intent to engage in the substantive RICO violations.

Defendants O'Brien and Fox committed at least two predicate acts or else aided and abetted such acts. The acts of racketeering activity were not isolated, but rather acts of Defendants O'Brien and Fox were related in that they had the same or similar purpose and result. Further, the acts of racketeering by Defendants O'Brien and Fox have been continuous over a period of four (4) years. There was a

close-ended scheme, consisting of related predicate acts repeated during the 4-year period.

The association-in-fact enterprise and the alternative enterprises, as alleged were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the racketeering activity for the legitimate business purpose of renewing expired or expiring VSCs for Orphan Holders. Defendants O'Brien and Fox have had, and do have, legitimate business plans outside of the pattern of racketeering activity.

Plaintiff alleges that Defendants O'Brien and Fox also participated in the operation and management of the association-in-fact enterprise and the alternative enterprises alleged by engaging in and by overseeing and coordinating the commission of multiple acts of racketeering.

Defendant O'Brien committed indictable offenses under 18 U.S.C. § 1832 in that he (a) with the intent to convert a trade secret, (b) that is related to a product or service used in interstate or foreign commerce, (c) to the economic benefit of Defendants BI and EGS, (d) and intending or knowing that the offense will injure EFG, the owner of the trade secret, (e) knowingly, and without authorization appropriated the information. Specifically, Defendant O'Brien knew that on February 7, 2017, EFG terminated the 2008 Private Label Agreement, the 2009 Seller Agreement, the January 2015 Seller Agreement, and the October 2015 Seller

Agreement with Defendants BI and EGS, respectively, and further that EGS did not own the Customer Data to be used to solicit Orphan Holders to renew TechChoice VSCs; on June 5, 2017, Defendant O'Brien nonetheless appropriated the Customer Data in violation of 18 U.S.C § 1832 when he swore to a verified petition that asserted Defendants BI and EGS owned the Customer Data, that EFG was merely storing it for Defendants BI and EGS, that it qualified as trade secret under §417.453(4), RSMo, and that NVPS' possession and use of the Customer Data constituted misappropriation of Defendants BI and EGS' trade secrets under §417.453(2), RSMo. Plaintiff believes Defendant O'Brien's objective was to divert funds to his own benefit from the renewal of TechChoice VSCs by NVPS to Orphan Holders that would have been paid to EFG.

Plaintiff believes O'Brien, Fox, BI and EGS paid damages to EFG in an amount up to $3,000,000 for these offenses with the money extracted from Plaintiff's 49% management fee.

Defendant Fox committed indictable offenses under 18 U.S.C. § 1832 in that he (a) with the intent to convert a trade secret, that is related to a product or service used in interstate or foreign commerce, to the economic benefit of Defendants BI and EGS, and intending or knowing that the offense will injure EFG, the owner of the trade secret, knowingly, and without authorization appropriated the information. Specifically, on February 7, 2017, Defendant Fox knew that the

appropriation of the Customer Data to be used to solicit Orphan Holders to switch to competing Omega VSCs was not authorized by EFG; on April 21, 2017, Defendant Fox appropriated the Customer Data in violations of 18 U.S.C § 1832 when he nonetheless sent a total of 6,907 "pink notices" to solicit Orphan Holders to switch to competing Omega VSCs; Defendants BI and EGS sold fifty (50) Omega VSCs to Orphan Holders, forty four (44) to Orphan Holders with active TechChoice VSCs administered by EFG.

In the alternative, each individual use of the Customer Data to solicit 6,907 Orphan Holders to switch to competing Omega VSCs is a separate predicate act. In the alternative, each individual use of the Customer Data to sell Omega VSCs to Orphan Holders is a separate predicate act.

Defendant Fox's objective was to divert funds to his own benefit from the sale of Omega VSCs to Orphan Holders that would have been paid to EFG.

Plaintiff believes Defendants O'Brien, Fox, BI and EGS paid damages to EFG in an amount up to $3,000,000 for these offenses, with the money coming from Plaintiff's 49% management fee.

Defendant Fox committed indictable offenses under 18 U.S.C. § 1343 in that he having (a) devised or intended to devise a scheme or artifice (b) to defraud Plaintiff or to obtain money from Plaintiff (c) by means of false or fraudulent pretenses, representations or promises, (d) transmitted or caused to be transmitted,

(e) by means of wire, radio, or television communication, (f) in interstate or foreign commerce, (g) any writings, signs, signals, pictures, or sounds, (h) for the purpose of executing such scheme. These acts were done intentionally and knowingly with the specific intent to advance Defendant Fox's scheme or artifice. Specifically, on March 12, 2015, Defendant Fox devised a scheme to defraud Plaintiff of its 49% of distributions pursuant to the Management Agreement when he directed or in the alternative was informed of the establishment of the Secret Overfund; on April 2, 2015, Defendant Fox misrepresented to Plaintiff by email in which he attached a draft Management Agreement to be reviewed that "the management fee for Paragon is 49% of net revenue, less all overhead costs of operating the business;" on February 26, 2016, Defendant Fox misrepresented to Plaintiff by email in which he attached the Management Agreement to be executed that "the management fee for paragon is 49% of net revenue, less all overhead costs of operating the business;" Defendant Fox repeatedly emailed or caused to be emailed false EGS Funding Reports to Plaintiff, on a weekly basis, including one on March 27, 2015 in the amount of $15,953.41 and continuing weekly thereafter including one on March 2, 2018 in the amount of $13,249.37; Defendant Fox repeatedly transmitted or caused to be transmitted a weekly payment to be made to Plaintiff in the amount of the corresponding weekly false EGS Funding Report via wire transfer to Plaintiff's bank account at Commerce

Bank branch in Belleville, Illinois, to include the wire transfer on March 27, 2015 in the amount of $15,953.41 and every week thereafter to include the wire transfer on March 1, 2018 in the amount of $13,249.37; and on March 12, 2019, Defendant caused the expenses and reserves of the Business to be overstated and caused false financial statements to be emailed to Plaintiff. These acts were done intentionally and knowingly with the specific intent to advance Defendant Fox's scheme or artifice.

In the alternative, each email of a fraudulent EGS Funding Report to Plaintiff and each wire transfer based on a fraudulent EGS Funding Report in furtherance of Defendant Fox's scheme is a separate predicate act. Defendant Fox's objective was to offset Defendants BI, EGS, O'Brien's and Fox's joint and several liability to EFG by depriving Plaintiff of its 49% distribution.

Plaintiff has been damaged as a direct and proximate result of Defendant Fox's conduct and participation in such enterprise.

Defendant Fox's violations of federal law as set forth herein, each of which directly and proximately injured Plaintiff, constituted a continuous course of conduct spanning a period of four (4) years, which was intended to obtain money from more than one victim through false pretenses, false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a

part of a closed-in pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

Defendant Fox has conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein violation of 18 U.S.C § 1962(c). The unlawful actions of Defendant Fox have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in its business. Plaintiff seeks an award of damages in compensation for, among other things, the millions of dollars deprived from it to offset Defendants BI, EGS, O'Brien's and Fox's joint and several liability to EFG. Plaintiff has been harmed by this conduct.

Count II of the Second Amended Complaint is a breach of contract claim against EGS.  It alleges the Management Agreement between Plaintiff and EGS is a valid and enforceable contract, that Plaintiff performed its obligations under the contract and Defendant breached the contract by (a) Failing to include the administration revenue for EVG administration of Omega VSCs sold by the Business in the calculation of calculating Net Revenue; (b) Failing to include the administration revenue for EVG administration of Omega "M2M" VSCs sold by the Business in the calculation of Net Revenue; (c) Making intercompany transfers to EVG that do not correlate to the funding reports as administrative revenue and then deducting those transfers from Net Revenue; (d) Failing include overfunds,

29

including the Secret Overfund, in the calculation of Net Revenue; (e) Failing to accurately calculate Net Income of the Business; (f) Overstating the operating expenses and reserves of the Business; (g) Deducting expenses to defend the EFG lawsuit from the Net Revenue of the Business; (h) Deducting fee-based management fee expenses from the Net Revenue of the Business; (i) Deducting undocumented "unbilled expenses" from the Net Revenue of the Business; (j) Failure to accurately calculate Payroll Expense of the Business; (k) Changing the methodology for calculating contract reserves for the TechChoice and Omega VSCs for the purpose of reducing Plaintiff's 49% distribution of reserves to zero; (l) Deducting reserves other than reasonable contract reserves from the Net revenue of the Business; (m) Failing to pay Plaintiff 49% of the Net Income of the Business.

As a direct and proximate result of Defendant EGS' breaches, Plaintiff suffered general damages in excess of seventy-five thousand dollars ($75,000.00).

Count III of the Second Amended Complaint is brought for a breach of the implied covenant of good faith and fair dealing against Defendant EGS.  It alleges that the Management Agreement implies a duty of good faith and fair dealing, and that Plaintiff has fully performed the Management Agreement.  It further alleges the Management Agreement vests EGS with broad discretion in calculating Net Revenue, Net Income, and Reserves for the purpose of calculating the

"management fee" payable to Plaintiff.  It further alleges EGS breached this duty by (a) Failing to include the administration revenue for EVG administration of Omega VSCs sold by the Business in the calculation of Net Revenue; (b) Failing to include the administration revenue for EVG administration of Omega "M2M" VSCs sold by the Business in the calculation of Net Revenue; (c) Making intercompany transfers to EVG that do not correlate to the funding reports as administrative revenue and then deducting those transfers from Net Revenue; (d) Failing include overfunds, including the Secret Overfund, in the calculation of Net Revenue; (e) Failing to accurately calculate Net Income of the Business; (f) Overstating the operating expenses and reserves of the Business; (g) Deducting expenses to defend the EFG lawsuit from the Net Revenue of the Business; (h) Deducting fee-based management fee expenses from the Net Revenue of the Business; (i) Deducting undocumented "unbilled expenses" from the Net Revenue of the Business; (j) Failure to accurately calculate Payroll Expense of the Business; (k) Changing the methodology for calculating contract reserves for the TechChoice and Omega VSCs for the purpose of reducing Plaintiff's 49% distribution of reserves to zero; (l) Deducting reserves other than reasonable contract reserves from the Net revenue of the Business; (m) Failing to pay Plaintiff 49% of the Net Income of the Business.

As a direct and proximate result of Defendant EGS' breaches, Plaintiff alleges it suffered general damages in excess of seventy-five thousand dollars ($75,000.00).

Count IV is brought against Defendant Fox for alleged fraud, claiming Fox made a statement to Plaintiff's president in the form of emails wherein he attached a draft Manage Agreement, and the Management Agreement  to manage the Renewal Center for a fee of 49% of the net revenue, less overhead costs of operating the business.  It further alleges Dox made a statement to Plaintiff's president.

Fox allegedly made false material statements with the intent of harming Plaintiff or in reckless disregard for the trust of the misrepresentations to Plaintiff's president, in the form of EGS funding reports setting out the purported net revenue for several weeks which were false because they did not include the Secret Overfund in the calculations of net revenue. Plaintiff relied on these statements.

Count V is brought against Defendant Fox for negligent misrepresentation. Plaintiff seeks compensatory and punitive damages for Fox's gross negligence in the above representations.

Count VI claims a conspiracy to breach the contract brought against EFS, EGS, EVS, EGV, BI, STS, O'Brien, and Fox.  Plaintiff alleges that by concerted action, each of the eight (8) Defendants combined for the unlawful purpose of

breaching the Management Agreement with Plaintiff for the management of the Business in order to offset legal liabilities to EFG for the misappropriation of Customer Data or otherwise reduce payment to Plaintiff under the Management Agreement, pursuant to which (a) EFS' role was to fail to include its revenues in the Net Revenue of the Business to deprive Plaintiff of its 49% distribution; (b) EGV's role was to fail to include its revenues in the Net Revenue of the Business to deprive Plaintiff of its 49% distribution; (c) Defendants BI, EGS, O'Brien and Fox's roles were to deduct legal expenses from the Net Revenue of the Business to cover their joint and several legal liability arising from their misappropriation of Confidential Customer Data from EFG to deprive Plaintiff of its 49% distribution; (d) Defendant STS' role was to fail to accurately calculate personnel and related expenses of the Business to deprive Plaintiff of its 49% distribution; and (e) Defendant EVS' role was to manipulate the financial statements of the Business to deprive Plaintiff of its 49% distribution.

In furtherance of the conspiracy, Defendant Fox committed the overt tortious act or unlawful act of making fraudulent and/or negligent misrepresentations to Plaintiff that its management fee is 49% of net revenue.

As a direct and proximate result of Defendants' conspiracy to breach the Management Agreement, Plaintiff suffered general damages in excess of seventy-five thousand dollars ($75,000.00.

Defendant moves to dismiss Plaintiff's Second Amended Complaint for failure to state a cause of action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## Standard of Review

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and deigned to fail, thereby sparing the litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001). This court "accepts as true the complaint's factual allegations and grants all reasonable inferences to the non-moving party." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018)(citations omitted).

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *McShane Constr. Co., LLC v. Gotham Ins. Co.*, 867 F.3d 923, 927 (8th Cir. 2017), *quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint "must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *Id.*, *quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.*, *quoting Iqbal*, 556 U.S. at 678; *see also, Metro. Omaha Prop. Owners Ass'n, Inc. v. City of Omaha*, No. 20-1006, 2021 WL 952678, at *2 (8th Cir. Mar. 15, 2021).

## Discussion

### Motion to Dismiss Second Amended Complaint

### Count I-RICO

Defendants argue Plaintiff's RICO claim against O'Brien and Fox set forth in Count I must be dismissed because Plaintiff has failed to plausibly allege the existence of a criminal enterprise and a pattern of racketeering activity.

"The major purpose behind RICO is to curb the infiltration of legitimate business organizations by racketeers." *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 990 (8th Cir. 1989)(*citing United States v. Turkette*, 452 U.S. 576, 591 (1981)). RICO, codified at 18 U.S.C. §§ 1961 *et seq.*, provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). To state a RICO claim, Plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009)).

### Financial Loss

Defendants argue Plaintiff lacks standing to pursue its RICO claim because it fails to allege a concrete financial loss that was caused by Defendants' alleged secret misappropriation of trade secrets from a third party.  Contrary to Defendant's argument, the Second Amended Complaint sets forth sufficient allegations of concrete financial losses.  It alleges that as a result of Defendants' trade secret misappropriation, the $100 and $125 overfunds, portions of which were not paid to Plaintiff, were to be reserved for liability to EFG for this trade secret misappropriation; the Secret Overfund was Net Revenue of the Business for the purpose of calculating the 49% distribution to Plaintiff; the legal expense deducted from the Net revenue of the Business for Defendant EGS' misappropriation of the Customer data is the sole liability of Defendant EGS, not an operating expense of the Business, and was deducted to offset Defendants BI, EGS, O'Brien and Fox's legal liability to EFG; on March 1, 2019, defendant Fox sent an email to Plaintiff to schedule a meeting to review the current state of the Business, including the amount of excess reserves as of the end of 2018 and stated that "EFG never returned premium to us causing a deficit in the position;" any EFG obligation for returned premium was not chargeable to the reserves; it was either offset by Defendants' payment to EFG to settle the EFG lawsuit, or not due, and not attributable to plaintiff, pursuant to the 2015 Seller Agreement or the October 2015 Seller Agreement; and on September 27, 2018, the parties settled the

Second Amended Complaint pursuant to which Defendants BI, EGS, O'Brien, and Fox paid EFG up to $3,000,000.

**Existence of an Enterprise**

The term enterprise is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise must have a least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). "The enterprise is not the pattern of racketeering activity. Rather, the enterprise must have a common or shared purpose, some continuity of personnel, and an ascertainable structure distinct from the pattern of racketeering." *Asa-Brandt, Inc. v. ADM Investor Services, Inc.*, 344 F.3d 738, 752 (8th Cir. 2003)(citing *United States v. Turkette*, 452 U.S. 576, 583 (1981)).

Defendants argue Plaintiff's allegations are insufficient to allege the existence of an ascertainable structure distinct from the pattern of racketeering activity.

Plaintiff's Second Amended Complaint alleges Defendants had legitimate business purposes other than the claimed pattern of racketeering: procuring

agreements with vehicle dealerships and independent call centers for the sale of

TechChoice VSCs for EFG to administer pursuant to the 2008 Private Label

Agreement, and soliciting renewals and sales of TechChoice VSCs administered

by EFG pursuant to the 2009 Seller Agreement, the January 2015 Seller

Agreement, and the October 2015 Seller Agreement. Further, the Second Amended

Complaint sets forth that the enterprises were not limited to the predicate acts; they

went beyond the racketeering activity.  For the purposes of the Motion to Dismiss

the Court assumes the truth of these allegations and finds they are sufficient to

notify Defendants of the claims at this stage of the litigation.

**Existence of a Pattern**

For a pattern to exist there must be at least two acts of racketeering activity.

18 U.S.C. § 1961(5). "There are two issues here that should be kept distinct:

Whether the plaintiffs have sufficiently pleaded acts of racketeering, and whether

those acts can be said to form a pattern." *Abels v. Farmers Commodities Corp.*,

259 F.3d 910, 919 (8th Cir. 2001).

**Acts of Racketeering Activity**

The term racketeering activity is defined to include a variety of criminal

offenses under state and federal law including wire fraud, 18 U.S.C. § 1343-the

federal statute Plaintiff identifies as encompassing the predicate acts in this case.

18 U.S.C. § 1961(1). The violations of law are referred to as predicate offenses or

38

predicate acts and must be present to support the existence of a pattern of

racketeering activity. *Asa-Brandt*, 344 F.3d at 752.

Defendants argue the RICO count must be dismissed because it fails to

allege the on-going nature of the activity to establish a pattern.

These acts of wire fraud

> must be related and must "amount to or pose a threat of continued criminal
> activity." *United Healthcare Corp. v. American Trade Ins. Co., Ltd.*, 88 F.3d
> 563, 571 (8th Cir. 1996)(citation omitted). "The relationship prong of the
> pattern element is satisfied if the predicate acts 'have the same or similar
> purposes, results, participants, victims, or methods of commission, or
> otherwise are interrelated by distinguishing characteristics and are not
> isolated events.' " *Wisdom v. First Midwest Bank, of Poplar Bluff*, 167 F.3d
> 402, 406 (8th Cir. 1999)(quoting *Handeen v. Lemaire*, 112 F.3d 1339, 1353
> (8th Cir. 1997)). The continuity prong, "can be either closed-ended or open-
> ended. Closed-ended continuity involves 'a series of related predicates
> extending over a substantial period of time;' open ended continuity involves
> acts which, by their nature, threaten repetition into the future. Multiple
> predicates within a single scheme are encompassed within the RICO statute
> as long as the relationship and continuity elements are met." *Id.* (quoting
> *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893,
> 106 L.Ed.2d 195 (1989)). "The 'continuity' requirement generally requires
> proof that the predicate acts extended over a closed period of at least a year."
> *Webster Industries, Inc. v. Northwood Doors, Inc.*, 320 F. Supp. 2nd 821,
> 850 (N.D. Iowa 2004)(citing *Handeen*, 112 F.3d at 1353).

*Burchfield v. Alibaba Grp. Holding Ltd.*, No. 1:22-CV-01023, 2022 WL 2082306,

at *3–7 (W.D. Ark. May 17, 2022), *report and recommendation adopted*, No.

1:22-CV-1023, 2022 WL 2079880 (W.D. Ark. June 9, 2022).

The Eighth Circuit analyzes whether a plaintiff has stated a RICO pattern

based on the specific set of facts before it. In *Terry A. Lambert Plumbing, Inc., v.*

*Western Sec. Bank*, the plaintiff alleged bank defendants violated RICO by using the mails and telephone in order to defraud plaintiff and destroy the plaintiff company's status as a viable business entity. 934 F.2d 976, 979–80 (8th Cir. 1991). Specifically, defendants communicated with plaintiff for a short period of time concerning a loan for which defendants refused to disperse credit until plaintiff's default was cured. *Id.* at 981. The Court noted that plaintiff was aware of the terms of his loans and that plaintiff "essentially attempted to characterize commonly accepted banking procedures as racketeering." *Id.* In assessing the pattern element under RICO, the Court stated:

> Viewing the evidence in the light most favorable to Lambert, this case involves, at most, a plan to defraud a single company in connection with a single set of loan agreements. As noted above, a single transaction which involves only one victim and takes place over a short period of time does not constitute the pattern of racketeering required for long-term criminal activity under a RICO claim. There is no support in the record that a criminal scheme exists involving Robey and Western over a long period of time in connection with more than one victim.

*Id.* The Court upheld summary judgment granted in favor of defendants on plaintiff's RICO claim. *Id.* at 982.

Six years later, the Court decided *Handeen v. Lemaire*, 112 F.3d 1339, 1345 (8th Cir. 1997). In that case, a judgment creditor sued a debtor and the law firm that represented the debtor in his bankruptcy proceeding, alleging that defendants violated RICO by conspiring to minimize the creditor's recovery via inflation of the debtor's debts and manipulation of the bankruptcy system. *Id.* at 1343–44. The

40

Court held plaintiff's allegations sufficiently pleaded a pattern under RICO,

concluding that "the racketeering activity described in the Complaint, which began

in January 1987 and concluded with monthly acts of asserted mail fraud that

persisted through early 1990, was pervasive and is more than sufficient to

demonstrate closed-ended continuity." *Id.* at 1353. The Court further distinguished

the case from *Lambert*:

> The [defendant] places much stock in *Lambert*, 934 F.2d at 981, where we adjudged that "a single transaction which involves only one victim and takes place over a short period of time does not constitute the pattern of racketeering required for long-term criminal activity under a RICO claim." We still adhere to this statement, but we cannot classify the racketeering activity recounted by [plaintiff] as "a single transaction." Moreover, we do not believe a period exceeding three years represents "a short period of time."

*Id.* at 1354 n. 19.

Upon review of these two Eighth Circuit precedents, the Court holds that

Plaintiff pleaded a sufficient pattern of racketeering activity to survive a motion to

dismiss under 12(b)(6). Plaintiff alleges that Defendants, like those in *Handeen*,

engaged in a variety of "transactions" in furtherance of their scheme to defraud.

Moreover, the misrepresentations constituting the "predicate acts" of wire fraud

were allegedly committed on separate occasions. While, similar to *Lambert*, this

case involves a plan to defraud a single plaintiff. The facts alleged here, rather than

those described in *Lambert*, describe what appears to be a longer period of

predicate activity and more than a "single transaction. The Court concludes that

Plaintiff's allegations are pleaded with sufficient specificity to meet the requirements for a pattern of racketeering activity under RICO, at least to the extent necessary to defeat a motion to dismiss for failure to state a claim under Rule 12(b)(6). *BOKF, N.A. v. BCP Land Co., LLC*, No. 6:14-CV-03025-MDH, 2014 WL 12597510, at *8 (W.D. Mo. Dec. 23, 2014).

**Count II-Breach of Contract**

Defendants argue Count II fails to state a claim for breach of contract because it fails to allege that any of the deductions Defendants made when calculating Net Income were anything other than operating expenses that Defendants had the sole discretion to determine.  In response, Plaintiff sets forth several instances of deductions from Net Income which Plaintiff challenges as items which are a variety of other expenses which do not fall within the traditional definitions of "operating expenses."

Defendants also argue the alleged breaches of the Management Agreement are vague, non-specific, and insufficient.  Plaintiff sets forth a series of items which it contends breached the parties' Management Agreement.  Contained within these allegations are sufficient notice to Defendants of which actions, deductions, inactions, representations, and associations with each other which apprise Defendants of the alleged breach.  It is not appropriate at this juncture to ascertain whether these delineations constitute a breach of the agreement. Rather,

under Rule 12(b)(6), all that is required is for the pleading to contain sufficient factual allegations to notify defendants of the claim.  Determination of the validity of the claim occurs at later stages.

**Count III-Breach of Implied Covenants of Good Faith and Fair Dealing**

Defendant claims Count III should be dismissed because the contract at issue confers considerable discretion to some of the parties in performing their contractual duties.  As Plaintiff counters, this count alleges Defendants failed to perform their duties under the express terms of the agreement and performed their duties to deprive Plaintiff of what was due under the contract.  The Second Amended Complaint sufficiently alleges Defendants used improper methods of calculating the Operating expenses to the detriment of Plaintiff.  It sets forth inaccurate calculations which resulted in inaccurate amounts due Plaintiff.  Defendants' discretion was subject to a reasonableness element which Plaintiff alleges was not exercised.

**Counts IV and V-Fraudulent and Negligent Misrepresentations**

Defendants argue these counts require dismissal under the economic loss doctrine since Plaintiff is seeking damages in tort for damages which are contractual in nature. Plaintiff argues there is an exception to the economic loss doctrine that applies to inducement, and that it was induced to renew and to continue to renew TechChoice and Omega VSCs.  While Plaintiff may not be able

to withstand challenge in later stages of this litigation, for the purposes of Rule 12(b)(6), the Second Amended Complaint is sufficient.

**Count VI-Conspiracy**

Defendants argue that the acts of an agent are the acts of his/her principal and therefore there can be no conspiracy between principal and agent.  Again, this Court is not at liberty to ascertain whether the facts establish the Defendants are agents of each other or not.  Considering only the Second Amended Complaint and any reasonable inferences therefrom, the Motion is not well taken as to Plaintiff's Count VI.

## Motion to Dismiss Counterclaims

**Count I**

Plaintiff moves to dismiss the counterclaims brought by  EGV ("Defendant Administrator") and EGS ("Call Center") for breach contract for an alleged "pack" overpayment.   Defendant alleges that in connection with the Management Agreement, Plaintiff and Defendant Ensurety Ventures, LLC received a "pack" which increased the costs that were included in the price for which the extended service contracts were sold to customers. It further alleges Plaintiff proposed the concept of a pack payment to Defendant Administrator and the parties agreed on the amount of the payment.

The counterclaim further alleges that the amount of the pack that Plaintiff received for each extended service contract Defendant Call Center sold were paid and accounted for net of a pro-rata return of commissions in the event a contract holder cancelled his or her extended service contract before its expiration date. This counterclaim claims that Plaintiff was overpaid commissions because it did not return the pro-rata payment when service contracts were cancelled.

At this pleading stage, Plaintiff is informed of the claim against it. It alleges that the parties entered into the pack agreement through Plaintiff's offer and Defendant's acceptance to the agreed amount of the pack payment. Defendant claims the refund was taken into consideration when the payment was made. It sufficiently notifies Plaintiff of the claim and what the damages are for Plaintiff's failure to refund the overpayment. The counterclaim contains the bare minimum factual allegations to notify Plaintiff of the claim against it, but it is sufficient to state a claim under *Twombly* and *Iqbal*. The parties are free to engage in discovery to ascertain whether Defendant can prove the allegations of Count I of the Counterclaim.

**Count II**

Plaintiff moves to dismiss Count II of the Counterclaim because the Management Agreement does not provide for reimbursement for overpayments. Count II of the Counterclaim alleges that Plaintiff was overpaid for its share of the

Net Income and therefore it is required to reimburse Defendant Call Center.  It alleges parties agreed to a 51%/49% split of *Net Income*.  If a customer cancelled the service contract before expiration, the customer would be refunded the purchase price on a pro-rata basis, thus reducing the Net Income, and thereby resulting in an overpayment of the Net Income to Plaintiff.  Defendant is asserting that Plaintiff is not entitled to the overpayment amount because it does not constitute Net Income. The reasonable inferences to be drawn from Defendant's allegations are that Plaintiff was to be paid 49%  of Net Income and if it was paid more than that percentage, it was required to reimburse Defendant. Plaintiff is fully apprised of the claim against it.

### Conclusion

Based upon the foregoing analysis, both the Second Amended Complaint and the Counterclaims set forth claims upon which relief may be granted.  As such, the motions to dismiss will be denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint for Failure to State a Claim upon which Relief can be Granted, [Doc. No. 42], is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Dismiss

Defendants EGV Companies, Inc. and EGS Administration, LLC's Counterclaims,

[Doc. No. 46], is **DENIED**.

Dated this 27th day of September,  2022.


_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE